UNITED STATES of America,
Plaintiff–Appellee,

v.

Shawn Joaquin SMITH, aka "S–Man", Defendant–Appellant.

No. 89–10649.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 1991.

Decided April 24, 1992.

---

Annette R. Quintana, Las Vegas, Nev., for defendant-appellant.

Bradford R. Jerbic, Asst. U.S. Atty., Thomas R. Green, Asst. U.S. Atty., Las Vegas, Nev., for plaintiff-appellee.

Before: POOLE, REINHARDT, and FERNANDEZ, Circuit Judges.

REINHARDT, Circuit Judge:

Shawn Joaquin Smith appeals his conviction for attempted possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and use of a firearm in a drug traffick-

ing crime, in violation of 18 U.S.C. § 924(c)(1). Smith contends, *inter alia*, that the prosecutor's improper vouching during closing argument constituted plain error and warrants reversal of his conviction notwithstanding his failure to raise a contemporaneous objection. We agree.

## I

In 1988, United States Customs agents together with the Las Vegas Metropolitan Police Department began a sting operation designed to attract prospective buyers of large quantities of narcotics. On December 3, 1988, one of the agents was contacted by Leonard Erivin, who negotiated a preliminary deal for five kilos of cocaine at $14,500 per kilo on behalf of his associates and then gave the agent a telephone number for George Brown. Another member of the undercover team, Detective Davis, contacted Brown and arranged a preliminary meeting at Carrows Restaurant. At the restaurant, Brown informed Davis that he represented another person, whom he identified as his "main man" or "money man".

On December 5, after obtaining a sample of the cocaine from Davis and Detective Orduno, who posed as the supplier, Brown drove to Lisbon Hall's house. When Brown arrived at the house, nobody was there. The officer who had followed Brown from the meeting with Davis and Orduno saw Brown drive to a nearby store and place a call. Shortly thereafter, Hall arrived at the house with appellant Smith, and the three men entered the house together. Brown subsequently called Davis and arranged to conduct the cocaine transaction at Carrows Restaurant. The surveillance officer observed Hall and Brown leave the house in Brown's car with two satchels, later found to contain $71,500. Slightly later, Smith emerged from the house and drove off in the car in which he and Hall had arrived.

When the two vehicles arrived at the restaurant, Smith circled the parking lot two times before parking in a spot halfway between Orduno's car and the car driven by Hall and Brown. Hall and Brown entered the restaurant, where Brown met with Davis and Orduno. The four men then returned to the parking lot to conduct the transaction. When Hall and Brown handed over the money, Orduno gave a prearranged arrest signal by depressing the brake pedal three times, and surveillance officers placed Brown and Hall under arrest. Simultaneously, other officers arrested Smith. When the officers approached Smith's vehicle, they observed that he was holding a shotgun across his lap with the muzzle pointed toward the front of the door on the driver's side. The gun was later found to be loaded.

A grand jury returned a three-count indictment charging Hall, Brown, and Smith with conspiracy to possess a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count I); attempt to possess a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count II); and use of a firearm in a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (Count III). Brown entered a guilty plea to Counts I and II of the indictment and agreed to testify against Hall and Smith in exchange for a grant of immunity as to Count III.

At trial, Brown testified that when he arrived at Hall's house and found nobody there, he placed a call to Hall's car phone. Hall informed Brown that he was on his way to the house and that Smith was with him. During the rendezvous at Hall's house immediately prior to the final meeting at Carrows, Hall and Brown discussed the upcoming drug transaction and Smith participated in the conversation. At the end of the discussion, according to Brown, Hall told Smith to take the second car to the restaurant and to act as "the heavy in the background" during the transaction. Brown further testified that the shotgun that Smith was holding when he was arrested was taken from Hall's residence; however, Brown was unclear as to who had removed the shotgun from the house and placed it in the car. Brown also stated that he was not sure whether Smith had any monetary interest in the transaction.

During his closing argument, Smith's counsel attempted to discredit Brown's testimony by suggesting that Brown had a strong motive for testifying in a way that would help the prosecution:

[L]et me tell you some of the instances where he tried to mislead you. Not the prosecutor. He's got a job to do. It's his job to ask the questions. It's [Brown's] job to answer them truthfully and he didn't.

. . . .

You know nobody made George Brown plead guilty and they didn't. But I think George Brown came to the realization that he was the guy that made all the deals, that he was an absolute dead, stinkin' fish and he knew it.

And I think that you are entitled to assume that his lawyer told him that the only way you're not going to get the most serious penalty that the law allows is if you plead guilty. Because if you plead guilty then there are certain other benefits you may be entitled to under the new sentencing guidelines, benefits which can drastically and dramatically reduce a sentence. George Brown knew about those things when he came in here to testify.

Now, he also knew that if he got on the witness stand here and he said, no, I don't know Lisbon Hall. He wasn't in the restaurant to do any dope deal with me, he was just in there having a sandwich, and he had already as part of his guilty plea pled guilty to this offense, that the United States Government had the option of prosecuting him for perjury. They might have a little more incentive to prosecute him for perjury,

mightn't they, if he fouled up their case on them. Do you think that might be some incentive for him to tell it the way he believes the government wants to hear it? I think so.

. . . .

And what actually—what actually did [Brown] say? First of all we have to recognize that the questions he was asked were propounded by . . . the government prosecutor. And it's the government prosecutor's and the government's responsibility to prove the guilt of Shawn Smith beyond a reasonable doubt. And if he's not satisfied, meaning the prosecutor, if he's not satisfied with the answer he gets, he can ask other questions to give you more illumination to what the witness has testified.

Smith's counsel then went on to sum up the evidence for and against Smith. At one point he discussed a telephone log of calls made from a cellular phone in Hall's girlfriend's car that showed three calls made to Smith's residence. Smith's counsel pointed out that there had been no evidence that Smith was the person who received those calls, and characterized any attempt to imply that Smith had in fact received the calls as "a prosecutor's trick".[1]

In rebuttal, the prosecutor took heated exception to Smith's counsel's characterization of the prosecutor's role and to the suggestions made about Brown's motives and testimony. He stated:

That [getting a conviction] isn't a prosecutor's job. A prosecutor's job is to guarantee that every criminal defendant receives a fair trial. That's my job. A prosecutor's job is to turn over every

---

**1.** The full text of Smith's counsel's remarks regarding the telephone log reads as follows:

Now, [the prosecutor] is going to come up here on his last chance and he's going to say, well, look at these telephone logs here, we got this phone call on the 4th to Shawn Smith, 4:00 o'clock in the afternoon. You see, you don't like to say these things, but that's a prosecutor's trick. I don't delight in saying that, I don't delight in saying to you that police officers make mistakes, but they do.

But you see there's been not one scintilla of evidence . . . that anyone called Shawn Smith at any time from any telephone.

What there is evidence of, there's evidence that out of fourteen pages of telephone history, three calls were made on that telephone to a number in a home occupied by Shawn Smith. There has been no proof that Shawn Smith answered that phone . . . . And yet, [the prosecutor] continuously says, and he said it about Mr. Hall and he has said it about Mr. Smith that there were calls to Shawn Smith and I say, prove it . . . because he hasn't at this point.

piece of evidence to the defense if it would assist them. That's the prosecutor's job.

.... How many times did you see me during the course of trial give exhibits to the defense so that they can mark them? Or see me stipulate to the admission of exhibits for the defense? My job is to assure these individuals a fair trial, not to convict them.

....

.... Mr. Waterman implies that George Brown got up here and said whatever he wanted to say and that the prosecution wouldn't prosecute him for perjury, not if he brought him a conviction. Well, that's absurd. My job is to guarantee a fair trial. If any witness commits perjury on the stand it's my job to seek an indictment against him if I can prove it.

Later, commenting on Smith's counsel's discussion of the evidence, the prosecutor noted: "Truth isn't something to be abused like that. Truth is as it is. And the government's job is to find the truth, to ferret through all this confusion, to ferret through all the smoke screens and lead you to the truth." Still later, he returned again to Smith's counsel's attack on Brown's testimony: "[My grandmother] asked me, 'What do you do in a trial?' 'Present evidence.' 'And then what happens?' 'Well then I sit down and everyone says bad things about me.'.... But if I did anything wrong in this trial, I wouldn't be here. The court wouldn't allow that to happen." Smith's counsel did not raise an objection to any of these statements.

Smith was convicted of Counts II and III, the attempted possession and weapons charges, but acquitted as to Count I, the conspiracy charge. The district court sentenced him to consecutive terms of imprisonment of 151 months for Count II and 60 months for Count III, to be followed by a five-year term of supervised release. The court also imposed a fine of $17,500. Smith timely appealed both his conviction and his sentence.

## II

Smith first argues that there was insufficient evidence to support his conviction on either count. We will uphold a conviction against a challenge to the sufficiency of the evidence if a rational jury could find the defendant guilty beyond a reasonable doubt of each element of the crime with which he is charged. *United States v. Sarault*, 840 F.2d 1479, 1487 (9th Cir.1988). Applying that standard, we find that there was sufficient evidence to support Smith's conviction on both the attempted possession charge and the weapons charge.

## A

A conviction for attempt requires proof of both "culpable intent" and "conduct constituting a substantial step toward commission of the crime that is in pursuit of that intent." *United States v. Buffington*, 815 F.2d 1292, 1301 (9th Cir.1987) (citing *United States v. Snell*, 627 F.2d 186, 187 (9th Cir.1980), *cert. denied*, 450 U.S. 957, 101 S.Ct. 1416, 67 L.Ed.2d 382 (1981)). Smith argues that his conduct and the circumstances surrounding his arrest support neither the conclusion that he intended to possess the cocaine nor that he committed a substantial step toward such possession. He notes that he never exercised dominion or control over the cocaine, and contends that there is no evidence that he would have done so had the transaction been completed. He argues that he merely drove the second car at Hall's direction because Hall, Brown, and Smith "were too many for one car." At the time of his arrest, he was sitting in the car that he had driven and had made no movement toward the restaurant or toward Detective Orduno's car, the site of the purported cocaine deal. Although it is a close question with respect to Smith's first contention, we reject both of his arguments.

An individual cannot be convicted of attempted possession if the evidence against him would have been insufficient to convict him of possession had the crime

gone as planned.[2] The threshold question, therefore, is whether Smith's conduct was such that, had the delivery of the cocaine been completed, he could have been convicted of possession. Smith argues that he merely acted as a bodyguard or "heavy" during the transaction and that this is not enough to support a conviction. However, the evidence justified a finding by the jury that Smith's role was in fact greater.

Possession of a controlled substance with intent to distribute may be either constructive or actual. *United States v. Disla*, 805 F.2d 1340, 1350 (9th Cir.1986). Actual possession requires the ability to exercise dominion and control over the drug. *United States v. Penagos*, 823 F.2d 346, 350 (9th Cir.1987). In the absence of actual possession, constructive possession may be demonstrated if the defendant has the authority to dispose of the drug, either personally or through an agent, or if he is a participant in a joint venture, thereby sharing dominion and control over the drug with the other participants. *United States v. Restrepo*, 930 F.2d 705, 709–10 (9th Cir.1991). We find that under the evidence a jury could properly conclude that if the transaction had gone as planned, Smith would have acquired constructive possession of the cocaine by virtue of his participation in a joint venture with Hall.

Our prior decisions in possession cases provide no precise definition of "joint venture". In each of the cases in which we have found sufficient evidence to uphold a conviction on a joint venture theory, the evidence establishing the defendant's interest in the transaction has been considerably stronger than that offered against Smith. *See, e.g., Restrepo*, 930 F.2d at 708 (defendant participated in negotiations with undercover DEA agents and was waiting across the street when the actual transaction occurred); *United States v. Hernandez*, 876 F.2d 774, 775–76, 778 (9th Cir.)

(defendant had participated in prior negotiations with undercover DEA agents, was observed participating in "coordinated activity" surrounding delivery of the cocaine to co-defendant Montilla's apartment for sale to the undercover agents, and shared the apartment with Montilla), *cert. denied*, 493 U.S. 863, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989); *United States v. Valentin*, 569 F.2d 1069, 1071 (9th Cir.1978) (defendant attempted to retrieve parcel containing cocaine that had been mailed by defendant's brother). On the other hand, the evidence in the cases in which we have declined to find constructive possession has been substantially weaker. *See, e.g., Disla*, 805 F.2d at 1352 (defendant was in prison when cocaine shipment was seized and, although defendant had made "numerous calls" to his associates, the government produced no evidence as to the content of those calls); *United States v. Batimana*, 623 F.2d 1366, 1369 (9th Cir.) (defendants were with a friend when he took delivery of a package containing heroin and observed the contents of the package), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980); *Arellanes v. United States*, 302 F.2d 603, 605–07 (9th Cir.) (fact that wife traveled constantly with husband and told a friend "I'll bet you didn't know you were sitting on fifty pounds of weed" was insufficient to establish that wife constructively possessed marijuana found in husband's car), *cert. denied*, 371 U.S. 930, 83 S.Ct. 294, 9 L.Ed.2d 238 (1962). The case before us, therefore, requires that we explore further what the government must show in order to obtain a conviction on a joint venture theory.

Our prior decisions provide us with some guidance. The hallmark of a joint venture is that each participant shares the authority to exercise dominion and control over the drugs with the other participants. *Restrepo*, 930 F.2d at 710; *Valentin*, 569 F.2d at 1071. As to a particular defendant,

---

**2.** If such an individual is convicted of participating in a conspiracy to possess illegal narcotics, he may, of course, be convicted of an attempt offense based on the conduct of his co-conspirators. Thus, had Smith been convicted of conspiracy and had the appropriate *Pinkerton* in-

struction been given—which it was not—a conviction for attempted possession could have been founded on that ground. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

we determine whether that authority existed by considering the defendant's role in the transaction. "[C]oordinated activity among the defendants raises a reasonable inference of a joint venture...." *Hernandez*, 876 F.2d at 778. However, "mere association, without more, with the person who does control the drug or the property on which it is found, is insufficient to support a finding of possession." *Arellanes*, 302 F.2d at 606. In addition to association, the government must also establish that the defendant had a role in directing or planning the acquisition or transportation of the drugs, *Restrepo*, 930 F.2d at 708; *Valentin*, 569 F.2d at 1070–71; *cf. Hernandez*, 876 F.2d at 778 (evidence of " 'close and continuous working relationship with those ... who may have had actual physical possession' " is sufficient support for a finding of constructive possession) (quoting *United States v. Moreno*, 649 F.2d 309, 313 (5th Cir. Unit A 1981)), or that as a result of the transaction he acquired an ownership interest in them, *cf. Hernandez*, 876 F.2d at 778 (defendant's "admitted possessory interest in the apartment" supported an inference of constructive possession). We conclude that the evidence against Smith was sufficient to establish that Smith's involvement with Hall on the evening of December 5 went beyond "mere association" and rose to the level of a joint venture.

The critical piece of testimony establishing Smith's role in the attempted drug purchase—evidence which the surveillance officers could not supply—was that Smith participated in the final discussion regarding the transaction. Brown testified that during that discussion, which occurred inside Hall's house immediately prior to the meeting at Carrows, Smith and Hall together questioned him regarding the proposed deal and, in particular, regarding his knowledge of the seller. Based on this testimony, a jury could infer that Smith had a role in the planning of the transaction and in the decisionmaking process. On cross-examination, Smith's counsel made no effort to rebut such an inference by questioning Brown further about the exact nature and scope of Smith's participation in the discussions or about what was said by Hall and Smith individually. Accordingly, we think that a jury could conclude beyond a reasonable doubt that, had the transaction gone as planned, Smith would have acquired constructive possession of the cocaine as a joint venturer with Hall.[3]

We next consider whether the evidence against Smith was sufficient to establish both elements necessary for an attempt conviction. In order to constitute a "substantial step", conduct must go beyond mere preparation and must be "strongly corroborative of the firmness of a defendant's criminal intent." *Buffington*, 815 F.2d at 1301 (citing *United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir. 1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975)). Smith argues that his conduct on the evening of December 5 was exactly the type of conduct that we have previously found insufficient to establish the substantial step element of an attempt offense. He cites *United States v. Still*, 850 F.2d 607, 610 (9th Cir.1988), *cert. denied*, 489 U.S. 1060, 109 S.Ct. 1330, 103 L.Ed.2d 598 (1989), in which we reversed a conviction for attempted bank robbery where the defendant was sitting in a van with the motor running some 200 feet away from the bank at the time of his arrest and had made no actual movement toward the bank, and *Buffington*, 815 F.2d at 1303, in which we held that defendants who had parked their car some 150 feet away from a federal bank and had reconnoitered the area on foot "did not cross the boundary between preparation and attempt." Here, however, each participant in the joint venture did all that he could do to ensure the deal's completion. If the deal had been completed as planned, without any interference, Smith would not have been required to engage in any further acts. In fact, he

---

**3.** We note that the evidence also might be sufficient to support Smith's conviction of attempted possession on an aiding and abetting theory. The record reveals that the district court gave the jury an aiding and abetting instruction. However, on appeal the government does not urge that we affirm on that basis.

committed all the steps necessary on his part to the completion of the substantive offense. Under those circumstances, a jury could certainly conclude that Smith's conduct went beyond mere preparation.

▮ The second element of the attempt offense, culpable intent, can be inferred from the defendant's conduct and from the surrounding circumstances. *Buffington,* 815 F.2d at 1302. It follows from the discussion above that Brown's testimony and Smith's conduct, taken together, are sufficient to establish that Smith intended to do his part in connection with his joint venturer's effort to acquire actual possession of the cocaine. Smith contends that his conduct was similar to that at issue in *Buffington,* which we found insufficient to justify an inference of intent to rob a federal bank. In that case, the defendants parked their vehicle at a location that was equidistant from the federal bank, a state bank, and a shoe store and explored the area on foot, staying at least fifty yards from the bank at all times. 815 F.2d at 1295 & n. 1, 1302. We held that "[t]he evidence is focused no more on [the federal bank] than on other nearby institutions." *Id.* at 1302. However, we have found an inference of specific intent to be reasonable where it is clear from the circumstances that a defendant intended to attempt a particular crime. *See, e.g., United States v. Runco,* 873 F.2d 1230, 1232 (9th Cir.1989) (upholding conviction for attempted possession where the defendant agreed to purchase 20 kilos of cocaine and showed the agent the money necessary to establish his credit). This case falls in the latter category. There is no doubt as to the particular crime intended. Based on Brown's testimony and on Smith's actions on the evening of December 5, a jury could conclude beyond a reasonable doubt that Smith intended to participate in that crime.

B

▮ Section 924(c)(1) of Title 18 provides: "Whoever, *during and in relation to any ... drug trafficking crime ...* for which he may be prosecuted in a court of the United States, *uses or carries a firearm,* shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years...." 18 U.S.C. § 924(c)(1) (1988) (emphasis added). Smith contends that because a shotgun is primarily a sportsman's weapon and because there was no evidence that he owned the gun or that he actually intended to use it on the evening of December 5, his conviction on this count fails.[4]

Smith is correct that the mere presence of a firearm during a drug transaction is insufficient to support a conviction under section 924(c)(1). *United States v. Phelps,* 877 F.2d 28, 30 (9th Cir.1989). However, that statute does not require that the government demonstrate intent to *use* the firearm during the course of the drug transaction, but only that the defendant chose to carry the firearm "in relation to" that transaction. Neither the ownership of the firearm nor the primary non-criminal use to which the firearm is typically put is relevant.

▮ We will uphold a conviction under section 924(c)(1) if the evidence at trial established that a defendant who is charged with a drug-related crime under Title 18 carried a weapon during the crime and "had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such display or discharge in fact occurred...." *United States v. Stewart,* 779 F.2d 538, 540 (9th Cir.1985), *cert. denied,* 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987). That standard is met here. When Smith was apprehended, he was sitting in the car that he had driven to the restaurant with a

---

4. The government argues that Smith failed to preserve this issue for appeal. The record indicates that at trial, Smith's counsel properly raised motions for acquittal under Fed. R.Crim.P. 29(a) as to Counts I and II. The court denied both motions. At the close of all evidence, Smith's counsel requested that the court note for the record "our appropriate 29(b)." The government contends that, in light of Smith's prior Rule 29(a) motion, this request should be construed as relating to Counts I and II only. We do not think it appropriate to construe Smith's Rule 29(b) motion in so grudging a manner.

loaded shotgun across his lap. He had a clear line of vision to Detective Orduno's car, where the purported drug transaction was taking place. We think that a reasonable juror could conclude that Smith carried the shotgun in order to ensure that the cocaine transaction undertaken by Hall and Brown went as planned. *United States v. Mason*, 658 F.2d 1263, 1270–71 (9th Cir. 1981) (upholding convictions under section 924(c) where, although the guns were never displayed, the evidence showed that the defendants "were brought along for protection and [that] the guns were an integral part of their function"). Accordingly, we decline to set aside his conviction on the weapons count on the ground that it is unsupported by the evidence.[5]

## III

■ Next, Smith argues that the imposition of cumulative sentences for the attempted possession and firearms convictions violates the double jeopardy clause of the fifth amendment. The double jeopardy clause encompasses three protections. "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). Smith contends that because the prosecution relied on the same conduct to establish both offenses, the imposition of cumulative sentences for those offenses violates the third principle stated in *Pearce*. We disagree.

*Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), sets forth the test that courts must follow to determine whether punishment under two separate statutory provisions violates the double jeopardy clause. "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not." *Id.* at 304, 52 S.Ct. at 182. However, the Court has also articulated a significant limitation on the *Blockburger* test. "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 677, 74 L.Ed.2d 535 (1983). In other words, the *Hunter* Court recast the *Blockburger* test as a " 'rule of statutory construction' " which does not apply where there is " 'a clear indication of contrary legislative intent.' " *Id.* at 367, 103 S.Ct. at 678 (quoting *Albernaz v. United States*, 450 U.S. 333, 340, 101 S.Ct. 1137, 1142, 67 L.Ed.2d 275 (1981)).

■ Section 924(c)(1) of Title 18, quoted above, expressly authorizes the imposition of a five-year sentence *"in addition to* the punishment provided for [the] … drug trafficking crime" that serves as the predicate offense. *Id.* (emphasis added). Smith concedes that it is clear that Congress intended to impose cumulative punishments for a substantive drug offense and a related firearm offense. *Cf. United States v. Browne*, 829 F.2d 760, 767 (9th Cir.1987) (double jeopardy clause does not prevent imposition of a cumulative sentence under section 924(c) for use of a firearm during armed bank robbery), *cert. denied*, 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988); *United States v. Shavers*, 820 F.2d 1375, 1377–78 (4th Cir.1987) (same). However, he maintains that there is no evidence that Congress intended to punish cumulatively for an *attempt* offense and a related firearm offense. We find no basis for this distinction.

Section 924(c) authorizes the imposition of cumulative punishment for the use of a firearm in relation to any federal drug trafficking crime. 18 U.S.C. § 924(c)(1). At-

---

5. Smith also contends that his conviction under section 924(c)(1) fails because there was insufficient evidence to support his conviction for attempted possession of a controlled substance with intent to distribute, and thus no predicate offense to support his weapons conviction. In light of our holding in Section A, *supra*, this argument also fails.

tempt to possess a controlled substance with intent to distribute is such a crime. 21 U.S.C. §§ 841(a)(1), 846. Moreover, the statute goes on to define "drug trafficking crime" to include any offense included in the Controlled Substances Act. 18 U.S.C. § 924(c)(2). That Act included a provision criminalizing attempt to commit a federal narcotics crime. Pub.L. No. 91–513, Title II, § 406, 84 Stat. 1236, 1265 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4566, 4595. We note that the Seventh Circuit has upheld the imposition of cumulative punishments for conspiracy to possess a controlled substance and a related firearm offense. *United States v. Powell*, 894 F.2d 895, 899–900 (7th Cir.), *cert. denied*, 495 U.S. 939, 110 S.Ct. 2189, 109 L.Ed.2d 517 (1990). Because a single statutory provision, section 846 of Title 21, criminalizes both conspiracy and attempt, it is singularly unlikely that Congress intended to authorize cumulative punishment in the case of one but not the other. Accordingly, we conclude that the cumulative punishments imposed on Smith are consistent with the principle set forth by the Court in *Hunter* and do not violate the fifth amendment.

### IV

■ Finally, Smith contends that the prosecutor's closing remarks constituted improper prosecutorial vouching for Brown. He urges that the prosecutor's comments were so egregious that they rise to the level of plain error, and that his conviction should therefore be set aside notwithstanding his counsel's failure to raise a contemporaneous objection.[6] *United States v. Wallace*, 848 F.2d 1464, 1473 (9th Cir.1988). Because the prosecutor vouched not only on behalf of the government in general but also on behalf of the court specifically, we are persuaded that plain error occurred.

Improper prosecutorial vouching occurs when the prosecutor "place[s] the prestige of the government behind the witness" by providing "personal assurances of [the] witness's veracity." *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir.1980), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981). In the case before us, the prosecutor's response to Smith's counsel's attack on Brown's credibility constituted the sort of personal and institutional guarantee that the law forbids. By assuring the jury that Brown could not just "g[e]t up here and sa[y] whatever he wanted to say" because he would prosecute him for perjury if he did so, the prosecutor was in fact commenting on Brown's actual testimony. Those remarks made it clear that no such prosecution of Brown was intended. The conclusion that followed inexorably from the remarks was that in the prosecutor's opinion Brown's testimony was true.

The prosecutor reinforced this message with repeated comments aimed at establishing his own veracity and credibility as a representative of the government. He repeatedly assured the jury that his job was not to seek a conviction but rather to guarantee a fair trial and turn over any favor-

6. Smith also raises another claim of plain error. On the third day of the seven-day trial, the court suggested that current copies of the Los Angeles Times and the New York Times be placed in the jury room in order to allow the jurors access to news materials while at the same time shielding them from articles about the trial that might appear in the local newspapers. Although this practice is certainly undesirable, none of the attorneys involved in the trial raised any objection to it. Smith now contends that the court's decision to introduce news materials into the jury room constituted plain error and that reversal of his conviction is required in order to prevent a miscarriage of justice. *United States v. Giese*, 597 F.2d 1170, 1199 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979).

It is undisputed that Smith's counsel did not merely fail to object to the court's proposal, but affirmatively indicated his agreement by saying: "Let's try it." Thus, Smith may well have waived any claim of error. It is also undisputed that the newspapers placed in the jury room contained articles relating to drug smuggling and drug trafficking, but that none of the articles related to the trial or to the Las Vegas sting operation. Accordingly, it is far from clear that Smith could establish plain error even assuming that no waiver occurred. However, in light of our conclusion that the prosecutor's closing remarks amounted to plain error and that reversal of Smith's conviction is required on that ground, we need not consider this issue further.

able evidence to the defense. Later, not content to rest on his previous efforts, he returned to this theme again, noting that "the government's job is to ... ferret through all the smoke screens and lead you to the truth." Finally, he stated: "[I]f I did anything wrong in this trial I wouldn't be here. The court wouldn't allow that to happen." The cumulative effect of these statements was to submit the prosecutor's personal conviction of Smith's guilt, together with the government's as a whole, as factors for the jury to consider in its deliberations along with the actual evidence. Because of the unique power that attends the prosecutor's special role, that is something he may not do. *United States v. Garza,* 608 F.2d 659, 665 (5th Cir.1979). " 'The prosecutor may neither dispense with the presumption of innocence nor ... sit as a thirteenth juror.' " *Id.* (quoting *Hall v. United States,* 419 F.2d 582, 587 (5th Cir.1969)). The prosecutor's statements were clearly improper.

Improper prosecutorial vouching also occurs when the prosecutor "indicate[s] that information not presented to the jury supports the witness's testimony." *Roberts,* 618 F.2d at 533. Under this standard, the prosecutor's statement that the court wouldn't allow him to do anything wrong was also clearly improper. That statement, in effect, attributed to the court some independent knowledge regarding the government's decision to prosecute Smith and its subsequent conduct of the trial. Moreover, it suggested to the jury that the court also was satisfied as to the truth of Brown's testimony. *Id.* at 534. Just as the prosecutor may not take advantage of

his special role as representative of the sovereign to imply that the government's investigatory apparatus is satisfied of the defendant's guilt, even more so may he not abuse his position and his obligation to see justice done by imputing such satisfaction to the court.

 The government, relying on *United States v. Young,* 470 U.S. 1, 12–13, 105 S.Ct. 1038, 1044–45, 84 L.Ed.2d 1 (1985), suggests that the prosecutor's comments were an excusable "invited response" to the statements made by Smith's counsel. We do not think that the transcript of those statements reveals anything other than a legitimate attempt by defense counsel to cast doubt on the credibility of a government witness who is testifying pursuant to a plea bargain. Smith's counsel accused Brown of wanting to please the government. At no time did he accuse the prosecutor of withholding evidence or suborning perjury. In fact, he made clear that it was not his intent to do so.[7] Attacks on the credibility of a defense witness are legitimate tools of advocacy and do not, standing alone, trigger the invited response rule. *United States v. Skarda,* 845 F.2d 1508, 1511 (8th Cir.1988). However, even if we were to conclude that Smith's lawyer's comments touched on the prosecutor's integrity as well as that of Brown and thereby invited a response, only a far more limited statement would have been justified.[8] *Young,* 470 U.S. at 12–13, 105 S.Ct. at 1044–45 (noting that the prosecutor may "d[o] no more than respond substantially in order to 'right the scale.' ").

---

7. Smith's counsel said with regard to Brown's testimony:

 [L]et me tell you some of the instances where he tried to mislead you. Not the prosecutor. He's got a job to do. It's his job to ask the questions. It's [Brown's] job to answer them truthfully and he didn't.

 Even Smith's counsel's remark about the probative value of the telephone log that showed calls to Smith's residence, in which he characterized any attempt to imply that Smith had in fact received those calls as a "prosecutor's trick", *see supra* note 1, amounted to no more than an attempt to undermine the government's case by an appeal to the jury to separate fact from inference.

8. The first part of the prosecutor's response to Smith's counsel was as follows:

 That [getting a conviction] isn't a prosecutor's job. A prosecutor's job is to guarantee that every criminal defendant receives a fair trial. That's my job. A prosecutor's job is to turn over every piece of evidence to the defense if it would assist them. That's the prosecutor's job.

 Even were we to assume that this first comment, standing alone, would have qualified as an "invited response", the full exegesis could not properly be so characterized.

The prosecutor's recurrent harping on the issue of his special role was clearly improper. The repeated comments also demonstrate that the errors were not inadvertent; clearly, we are not dealing with a spontaneous comment that could be regretted but not retracted.

■ Having determined that the prosecutor's statements cannot properly be characterized simply as an invited response, we turn to the separate question whether those statements were sufficiently egregious to amount to plain error. The plain error doctrine allows reversal only for "those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" *Young,* 470 U.S. at 15, 105 S.Ct. at 1046 (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). In other words, we may reverse Smith's conviction only if the prosecutor's improper conduct so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict and deprived Smith of a fair trial. *Id.; see also United States v. Giese,* 597 F.2d 1170, 1199 (9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979).

We are well aware of the rule that we must consider the challenged comments in the context of the entire trial, in order to avoid "'turn[ing] a criminal trial into a quest for error.'" *Young,* 470 U.S. at 16, 105 S.Ct. at 1046 (quoting *United States v. Johnson,* 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring)); *see also United States v. Simtob,* 901 F.2d 799, 806 (9th Cir.1990). In this case, however, the jury's acceptance of Brown's testimony as true was of critical importance. As discussed above, Brown provided the only testimony indicating that Smith participated in a discussion between Hall and Brown regarding the transaction and, thus, the only evidence that Smith's role in the transaction was

that of a joint venturer—and even that testimony was scanty and conclusory. In order for the jury to be convinced beyond a reasonable doubt that Smith was guilty of attempted possession, it was essential that it have no reasonable doubts regarding the accuracy and reliability of Brown's account of the events.

We doubt that the remaining evidence against Smith would have been sufficient to support his conviction for attempted possession. That evidence did not establish that Hall shared any part of the ability to exercise dominion and control over the cocaine with Smith. The evidence consisted solely of records of several telephone calls from Hall's cellular phone to the house where Smith lived, the fact that Smith was with Hall and Brown at Hall's house, the fact that Smith followed Hall and Brown to Carrows Restaurant and circled the parking lot twice before parking, and the fact that Smith was sitting in the car holding a shotgun when he was arrested. Absent Brown's testimony, Smith's connections with Hall would not have demonstrated that Smith's level of involvement in the attempted purchase was sufficient to establish beyond a reasonable doubt the existence of a joint venture.[9] *Arellanes,* 302 F.2d at 606. We must therefore consider the prosecutor's improper vouching on behalf of Brown with special care, and we cannot presume that those comments played only a minor role in a largely predictable calculus. *Simtob,* 901 F.2d at 806 (where the outcome of trial "depended greatly" upon the credibility of a particular government witness, prosecutorial vouching on behalf of that witness "could well have had critical influence").

Mere statements of personal opinion, when invited, do not rise to the level of plain error, even if reversal would have been required had the defendant's counsel interposed a timely objection. *Young,* 470 U.S. at 16–19, 105 S.Ct. at 1046–48. In

---

**9.** Smith's acquittal on the conspiracy count demonstrates that, even with Brown's testimony, the evidence implicating Smith in the scheme concocted by Hall and Brown was far from overwhelming. The fact that the jury was unable to agree on one of the charges against

Smith supports our conclusion that the prosecutorial vouching on behalf of Brown rose to the level of plain error. *Cf. Simtob,* 901 F.2d at 806 n. 4 (noting that the inability of the jury to agree on one of the charges constituted further support for a finding of prejudice).

another invited response case, we even declined to find reversible error in a prosecutor's statement, over objection, that in order to believe the defendant's accusations, "you have to believe the Government of the United States, in the person of the prosecutor standing before you ... have suborned that perjury." *United States v. Flake,* 746 F.2d 535 (9th Cir.1984), *cert. denied,* 469 U.S. 1225, 105 S.Ct. 1220, 84 L.Ed.2d 360 (1985). This case, however, differs from *Young* and *Flake* in two respects. First, as we have discussed, this is not an invited response case. Second, the prosecutor in this case did not confine himself to remarks about his role and that of the government in ensuring a fair trial.

The prosecutor in this case not only placed the prestige of the law enforcement branch of government behind his conduct of the trial and behind Brown's testimony, he also engaged in an additional and separate form of vouching that is qualitatively different than the statements involved in *Young* and *Flake.* In addition to invoking the integrity of the government, he invoked the integrity of the court. He stated: "But if I did anything wrong in this trial, I wouldn't be here. The court wouldn't allow that to happen." This final remark cannot be classified as simply an arguably invited comment on the prosecutor's special role. Rather, unlike the other comments that courts have on some occasions reluctantly overlooked, it placed the imprimatur of the judicial system itself on Brown's credibility. That is something we simply cannot permit.

Where the determination of a defendant's guilt or innocence hinges almost entirely on the credibility of a key prosecution witness, allowing a conviction to be obtained by a prosecutor's deliberately vouching for that witness on behalf of the court would pose a clear threat to the integrity of judicial proceedings. That particular form of vouching goes beyond the mere proffer of an institutional warranty of truthfulness; rather, it casts the court as an active, albeit silent, partner in the prosecutorial

enterprise. In doing so, it strikes at two principles that lie at the core of our system of criminal justice. The first of these is that "[t]he principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary...." *Coffin v. United States,* 156 U.S. 432, 453, 15 S.Ct. 394, 402, 39 L.Ed. 481 (1895). The second, long elevated to constitutional significance because it is so closely intertwined with the first, is that "to perform its high function in the best way 'justice must satisfy the appearance of justice.'" *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (quoting *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954)). If the prosecution may invoke the court as the guarantor of its truthfulness when the veracity of its star witness is challenged and can then survive review for plain error, both the actual likelihood and the perception that an accused will receive a fair trial—a trial in which he is presumed innocent and in which the government must prove every element of the charge against him beyond a reasonable doubt—are severely diminished. That result is untenable. Smith's conviction is accordingly reversed for plain error.[10]

REVERSED AND REMANDED.

POOLE, Circuit Judge, concurring in part and dissenting in part:

The government certainly presented sufficient evidence to convict Smith of attempted possession of a controlled substance with intent to distribute and use of a firearm in a drug trafficking crime. However, the majority is plain wrong in holding that the prosecutor's conduct in this case constituted plain error. During a criminal trial defense counsel and the prosecutor frequently find themselves in sharp, even vitriolic, exchanges. Such are not too unusual given the high emotions that often surround the charges against the defendant and the atmosphere of the trial. Such emotion and gamesmanship, and the prof-

---

**10.** Smith's conviction on the weapons count also falls if for no other reason than that no predi-

cate offense remains to support it.

fers of virtue by each side, do not justify unfairness or misconduct; however, I think this court should be careful about overestimating the actual impact of the prosecutor's comments upon a jury. Plain error is an extremely demanding standard, and I do not believe that any miscarriage of justice occurred in this case.

We can all agree that the prosecutor was out-of-bounds when he said that "the court wouldn't allow" him to do anything wrong. *See United States v. Roberts*, 618 F.2d 530 (9th Cir.1980) (government may not place its prestige behind a witness' testimony), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981); *United States v. Garza*, 608 F.2d 659 (5th Cir.1979) (improper for prosecutor to assert to jury that government has no interest in convicting innocent people). But he did not run off the reservation, and it is important to keep in mind what was happening here. Defense counsel had clearly hinted that the prosecutor would not mind if his witness "shaded the truth" a bit if that would help secure a conviction. This is an old tactic. Such insinuations are almost bound to trigger a response from the other side.[1]

Recognizing that the prosecutor made a mistake here does not lead to an inevitable conclusion that plain error should also be found. To reverse a conviction on this basis, we must find that the prosecutor's conduct "seriously affected the fairness, integrity, or public reputation of judicial proceedings," *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting *United States v. Atkin-*

*son*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)), or effected a "miscarriage of justice." *United States v. Wallace*, 848 F.2d 1464, 1473 (9th Cir.1988). Unless the prosecutor's statements were clearly calculated to affect the jury's ability fairly to consider the totality of the evidence—that is, unless it tainted the verdict and deprived Smith of a fair trial—reversal is unwarranted. *Wallace*, 848 F.2d at 1473.

No such miscarriage of justice occurred here. In the first place, the majority's discomfort notwithstanding, substantial evidence other than Brown's testimony supported the jury's verdict. *See United States v. Simtob*, 901 F.2d 799, 806 (9th Cir.1990) (closeness of case against defendant is a factor to weigh when considering claim of prosecutorial misconduct). The jury knew that Smith followed his co-conspirators to the restaurant where the trade with the undercover agent occurred and that Smith was apprehended by the police while he was sitting in his car with a loaded shotgun lying on his lap. Regardless of the prosecutor's gratuitous comments, a rational juror could readily conclude that the government had proved beyond a reasonable doubt that Smith was guilty. That is enough to preclude a finding of plain error. *See United States v. Kessi*, 868 F.2d 1097, 1107 (9th Cir.1989) ("We will seldom find plain error when evidence against the defendant is so strong that the absence of the prosecutor's misconduct would not have changed the verdict.") (citing *United States v. Giese*, 597 F.2d 1170,

---

1. I do not go so far as to insist that defense counsel in fact invited the prosecutor's responses. Defense counsel was certainly casting doubt on the government witness' testimony, although he did not, as in *United States v. Flake*, 746 F.2d 535 (9th Cir.1984), *cert. denied*, 469 U.S. 1225, 105 S.Ct. 1220, 84 L.Ed.2d 360 (1985), and *United States v. Skarda*, 845 F.2d 1508 (8th Cir. 1988), accuse the prosecutor of suborning perjury or withholding evidence. There is a distinction between undermining a witness' veracity and accusing him of perjuring himself as part of a deal with the prosecutor. Given that distinction, courts have often refused to find "invitation" even where the defense lawyer has said things much worse than this. *See, e.g., United States v. Young*, 470 U.S. 1, 4–5, 105 S.Ct. 1038, 1040–41, 84 L.Ed.2d 1 (1985) (defense counsel

called prosecutor's tactics "reprehensible" and "poison[ous]" and implied that prosecutor had not "acted with honor or with integrity."); *United States v. O'Connell*, 841 F.2d 1408, 1429 n. 19 (8th Cir.1988) (defense counsel labeled prosecutor's tactics "unfair," "wicked," and "poison[ous]"), *cert. denied*, 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989); *Skarda*, 845 F.2d at 1510–11 (no invitation where defense counsel strongly implied that prosecutors manufactured witness testimony and induced witness to support government theory by threatening to recommend harsh sentence for witness in another case). Perhaps we are justified in making allowances for the defense but holding the prosecutor—the agent of justice—to a higher standard. Nonetheless, the whistle does not automatically blow with every overreaching.

1199 (9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979)).

In any event, it simply is not true that the prosecutor's comments were "so pronounced and persistent that [they] permeated the entire atmosphere of the trial." *Flake,* 746 F.2d at 542. But that is the level to which the entire case must have descended in order to warrant reversal of Smith's conviction. *Id.* (citing *United States v. Lichenstein,* 610 F.2d 1272, 1281 (5th Cir.), *cert. denied sub nom., Bella v. United States,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980)). Defense counsel's comments to the effect that hoarding money might be considered evidence of drug dealing, and that the prosecutor would not mind if his witness told a story that helped the government's case, were clearly provocative, and it is likely the jury even expected that the prosecutor would not let this go without response. The prosecutor's reply was inartful and ill-considered, but was not alone so out-of-bounds that a reasonable juror could not simply have concluded that what he really was saying was that he did not intend to risk his reputation and career by seeking convictions by any means possible. The prosecutor's conduct was isolated, and unlike the situation in *Roberts* and *Garza,* he did not drag in matters outside the record. Nor did he make any attempt during the conduct of *his side of the case* to place the prestige of his office behind the witness.

Assuming that the prosecutor's comments exaggerated the purport of defense counsel's statements, they were "an insignificant blemish on what otherwise was an entirely fair proceeding." *Skarda,* 845 F.2d at 1511. Accordingly, I do not believe that the incident complained of justifies reversal of Smith's convictions.