993 F.2d 885
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ann KIM, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Keith KIM, Defendant-Appellant.
 Nos. 91-50403, 91-50404.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 1, 1993.
Decided May 11, 1993.
 
 1
 Before: D.W. NELSON, WIGGINS, and LEAVY, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 OVERVIEW
 
 3
 Ann Kim and Keith Kim were indicted on seven counts: (1) conspiracy to possess with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 846; (2) conspiracy to import methamphetamine, in violation of 21 U.S.C. § 963; (3) importation of methamphetamine, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1); (4) attempted importation of methamphetamine, in violation of 21 U.S.C. §§ 846, 952(a), and 960(a)(1); (5) attempted possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; (6) possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1); and (7) money laundering of $120,200 in cash, in violation of 18 U.S.C. § 1956(a)(1).
 
 
 4
 They were tried together and were convicted on each count. Ann Kim was sentenced to 151 months incarceration, and Keith Kim was sentenced to 188 months incarceration. Both appeal. We affirm.
 
 FACTS AND PRIOR PROCEEDINGS
 
 5
 Korean officials received a tip that an air cargo shipment of table lamps, destined for Los Angeles, would contain methamphetamine. Korean officials inspected a shipment of lamps that was bound for Los Angeles and found 20.6 kilograms of "ice" methamphetamine inside the lamps. After notifying the DEA in Korea and removing all the methamphetamine except for 600 grams, the Korean officials permitted delivery of the lamps.
 
 
 6
 DEA agents took custody of the shipment when it arrived in Los Angeles, tested the 600 gram sample, and found it to be methamphetamine. DEA agents then prepared the container for a controlled delivery by secreting the 600 gram sample back inside a lamp. They also placed sham narcotics inside each of the other lamps. Each bag of sham methamphetamine, along with the 600 gram sample, was covered with fluorescent powder that could be seen only under blacklight. A tracking/beeper device was also installed in the container. The container was then returned to customs.
 
 
 7
 The container was taken from customs by a commercial trucker to Acme International ("Acme") where it was placed in a rear storage area. Acme was listed as the mortgage broker responsible for importing the shipment through customs. Ann Kim kept Acme's books. Keith Kim worked as a tax preparer and had his office inside Acme. The shipment was incorrectly addressed to Joo Hun Lee's Tiffany, a company for which Acme had previously acted as mortgage broker.
 
 
 8
 The next day, a twenty-person surveillance team surrounded Acme during normal business hours. Shortly before 6:30 p.m., the surveillance team began a shift change, reducing its number to five. In the middle of the shift change, the beeper alerted, indicating that the crate had been opened. DEA Agent Mukai, realizing that he did not have enough agents, recalled those that had just left. He also ordered two agents to monitor Acme's front door. Shortly thereafter, these agents saw James Choi exit carrying a suitcase that Choi then placed into the trunk of a nearby Cadillac. James Choi reentered Acme.
 
 
 9
 Agents then approached the front door, heard movements inside, and announced that they were police. When no one answered, they forced entry. They arrested Ann Kim just inside the door. Agents then secured the rest of the building. Agents in the rear of the building arrested Kwang Sun Kim and James Choi as they ran from the rear exit. Keith Kim was in Korea at the time of the arrests. A subsequent blacklight test revealed fluorescent powder on the hands of Kwang Sun Kim and James Choi. Ann Kim had powder on her right thumb. After transporting the three suspects, the agents obtained a telephonic warrant to search the Cadillac and Acme. In the trunk of the Cadillac, agents found $20,000 in cash and a suitcase containing the 600 gram methamphetamine sample and the sham narcotics. Inside Acme, agents found five boxes of lamps near Ann Kim's desk, one box in Keith Kim's office, and the rest in the back room near the shipping container.
 
 
 10
 At the Kims' trial, Kwang Sun Kim and James Choi testified against the Kims pursuant to plea agreements. They testified that the methamphetamine importation conspiracy began with a $25,000 loan that Keith Kim arranged from Song Cho. This money was used by Kwang Sun Kim and Michael Hong to finance trips to Korea to purchase methamphetamine. Nine trips were made that resulted in six successful loads of over 70 kilograms in methamphetamine.
 
 
 11
 Kwang Sun Kim testified that he would purchase the methamphetamine in Korea, pack it in table lamps, and send the lamps to Los Angeles via air cargo. Keith Kim conceived the method of smuggling the methamphetamine inside lamps incorrectly addressed to Joo Hun Lee's Tiffany. The lamps were unloaded at Acme. Keith Kim was present at several unloadings. Kwang Sun Kim testified that after each delivery, Ann Kim would present him with a $100 to $200 invoice for Acme's brokerage services. Kwang Sun Kim would pay her between $1,000 and $5,000 to "take care of her." Ann Kim, who kept Acme's books, admitted that discrepancies existed in Acme's books regarding the importation of the lamps.
 
 
 12
 Prior to the eighth trip, Keith Kim suggested that the money needed to purchase methamphetamine be fronted in Korea by Keith Kim's friend, Yong Sul Kim. Yong Sul Kim would give money to Kwang Sun Kim in Korea after Keith Kim delivered the equivalent amount to Yong Sul Kim's daughter in Los Angeles. This arrangement was used on the eighth and ninth trips. Prior to the last trip, Keith twice delivered envelopes of money to Yong Sul Kim's daughter. Keith later had Ann Kim accompany Yong Sul Kim to a bank where she deposited $120,000 in cash for Yong Sul Kim into Acme's corporate account. She then purchased two cashier's checks that were deposited into accounts owned by Yong Sul Kim. Ann Kim did not list the $120,000 deposit in the set of Acme's books that was available to other Acme employees. In Korea, Yong Sul Kim then gave Kwang Sun Kim the money that was used to purchase the last shipment.
 
 DISCUSSION
 
 13
 I. The District Court did not Plainly Err by Admitting Multilevel Hearsay Evidence Regarding the Seizure of the Shipping Container by Korean Government Agents.
 
 
 14
 The Kims contend that the district court erred in admitting multilevel hearsay testimony from Agent Mukai regarding the seizure of the shipping container by the Korean government. Because the Kims' trial counsel did not object to the introduction of this evidence, we review for plain error. See United States v. Dischner, 974 F.2d 1502, 1515 (9th Cir.1992), cert. denied, 113 S.Ct. 1290 (1993); United States v. Ordonez, 737 F.2d 793, 799 (9th Cir.1984). " 'A plain error is a highly prejudicial error affecting substantial rights.' " Dischner, 974 F.2d at 1515 (citation omitted). The plain error doctrine is invoked to prevent a miscarriage of justice or to preserve the integrity and reputation of the judicial process. See United States v. Smith, 962 F.2d 923, 935 (9th Cir.1992). Even though the agent's testimony was hearsay, we conclude that its admission was not plain error.
 
 
 15
 Agent Mukai's testimony was given for the purpose of providing background information. Agent Mukai admitted that he had no personal knowledge as to whether Korean authorities had actually seized 20 kilograms of methamphetamine. His hearsay statement merely described why the DEA in Los Angeles became interested in the shipping container. His statement was not elicited to prove that Korean agents had actually intercepted 20 kilograms of methamphetamine.
 
 
 16
 Moreover, the Kims incorrectly argue that agent Mukai's testimony was at "the heart of the government's case." The government's case centered around the testimony of two coconspirators, Kwang Sun Kim and James Choi. Their testimony detailed a narcotics organization that successfully imported six loads of methamphetamine from Korea, containing over 70 kilograms. Their testimony further indicated that Kwang Sun Kim had purchased, packaged, and sent the 20 kilograms that the Korean government intercepted. They also testified about the money laundering scheme that Keith and Ann Kim had established. All this testimony was corroborated by other witnesses and documentary evidence such as phone tolls, hotel invoices, airline manifests, passports, and banking records. Accordingly, we conclude that the admission of Agent Mukai's testimony was not so "highly prejudicial" as to constitute plain error. See Dischner, 974 F.2d at 1515.
 
 
 17
 II. The District Court did not Abuse its Discretion by Denying the Kims' Post Trial Motion for Relief from Waiver Pursuant to Federal Rule of Criminal Procedure 12(f).
 
 
 18
 Rule 12(b) requires that motions to suppress evidence and requests for discovery be made prior to trial. Subsection 12(f) directs that failure to make such motions or requests constitutes a waiver. However, a district court may grant relief from waiver "for cause shown." Fed.R.Crim.P. 12(f). We review the district court's failure to find cause for an abuse of discretion. See United States v. Restrepo-Rua, 815 F.2d 1327, 1329 (9th Cir.1987); United States v. Gonzales, 749 F.2d 1329, 1336 (9th Cir.1984).
 
 
 19
 In their post trial motion under Rule 12(f), the Kims attempted to demonstrate "cause" by contending that their trial counsel incompetently failed to file three pretrial motions: (1) a motion to suppress the evidence seized from Acme, including evidence on Ann Kim's person; (2) a motion to suppress the 600 gram representative sample of methamphetamine; and (3) a discovery motion to uncover the identity of an informant. The district court denied these motions without an evidentiary hearing. Each of these motions was dubious. We find that the district court did not abuse its discretion by failing to find cause. Accordingly, we affirm the district court's denial of the Kims' motions. See Restrepo-Rua, 815 F.2d at 1329. The meritless nature of each of the Kims' motions is addressed below.
 
 
 20
 A. A Motion to Suppress Evidence Recovered From ACME and From Ann Kim's Person Would Have Failed.
 
 
 21
 The Kims contend that their Fourth Amendment rights were violated when the agents entered Acme without a warrant. Specifically, they contend that the warrantless search was not justified by exigent circumstances because the agents had ample time to obtain a search warrant before they entered Acme: 29 hours from the time the container was delivered to Acme and 30 minutes from the alert of the tracking/beeper in the container. However, the agents did not have probable cause during the 29 hours that the crate sat in Acme because they did not know who would pick up the crate or where it would be opened. Particularly considering that the 30 minute interval between the alert and entry into Acme came during a shift change, the agents did not have time to obtain a warrant. See e.g., United States v. Tarazon, No. 92-10204, slip op. at 2425-26 (9th Cir. Mar. 17, 1993) (finding that 30 minutes is insufficient time to obtain a telephonic warrant).
 
 
 22
 Moreover, because the tracking/beeper was in plain view in the box, the agents did not know if the occupants of Acme had spotted it. The agents also did not know how long the occupants would remain inside, and the agents did not have the manpower to properly follow each of the occupants if they left. Further, the agents saw James Choi exit Acme and place a suitcase in his car, and when they knocked and announced themselves, they heard movement but no one answered. Accordingly, we conclude that, under the totality of the circumstances, the agents had specific and articulable facts that justified their warrantless entry into Acme. See United States v. Castillo, 866 F.2d 1071, 1080 (9th Cir.1988); United States v. Licata, 761 F.2d 537, 543 (9th Cir.1985).
 
 
 23
 The Kims also seek to suppress Ann Kim's post arrest statement, blacklight test of her thumb, and cash seized from her purse because the officers did not have probable cause to arrest her. She asserts that the agents had no reason to believe that she was committing an offense. This is incorrect. The agents knew that Acme had closed for the day, that Ann worked at Acme, and that the container had been opened while she was inside Acme. Moreover, when the agents announced their presence, heard movements inside, and forced the front door open, they found Ann just inside the door where she had heard and ignored the agents' requests to open the door. Also, within several feet of Ann, the agents saw five of the lamps that they knew had contained the methamphetamine and sham narcotics. Therefore, we conclude that the agents had probable cause to arrest Ann Kim. See United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1295-96 (9th Cir.1988). Any search of her person incident to the arrest was valid. See United States v. Robinson, 414 U.S. 218, 234-35 (1973).
 
 
 24
 B. A Motion to Suppress the 600 Grams of Methamphetamine Would Have Failed.
 
 
 25
 The Kims contend that the actions of the Korean government in seizing and searching the shipping container are of primary significance in this case. Again, the core of the government's case came from the testimony of coconspirators and documentary evidence. See, supra, § I. The Korean seizure was mentioned to the jury primarily as background information. Moreover, nothing in the record indicates that United States officials had anything to do with the seizure. The Kims' brief merely speculates that United States officials were involved. Accordingly, we conclude that a motion to suppress the 600 grams of methamphetamine that was actually delivered to the conspirators would have failed.
 
 
 26
 C. A Motion Seeking Disclosure of the Informant's Identity Would have Failed.
 
 
 27
 Finally, the Kims' Rule 12(f) motion argued that their trial counsel should have requested the identity of the informant who alerted the Korean government to the shipment of methamphetamine. The Kims speculate that such an informant would "very likely" have produced exculpatory information. This is an insufficient basis for filing a discovery motion. See United States v. Sanchez, 908 F.2d 1443, 1451 (9th Cir.1990) (mere suspicion is insufficient to require disclosure). Accordingly, we conclude that the motion seeking disclosure of the informant's identity also would have failed.
 
 
 28
 III. The District Court did not Abuse its Discretion by Denying the Kims' Motion for a New Trial.
 
 
 29
 The Kims contend that the district court abused its discretion by denying their motion for a new trial based on newly discovered evidence and ineffective assistance of counsel. A motion for a new trial is reviewed for an abuse of discretion. See United States v. George, 960 F.2d 97, 101 (9th Cir.1992); United States v. Reyes-Alvarado, 963 F.2d 1184, 1188 (9th Cir.), cert. denied, 113 S.Ct. 258 (1992).
 
 
 30
 A. The Kims' Claim of Newly Discovered Evidence Fails to Meet the Requirements of Fed.R.Crim.P. 33.
 
 
 31
 To prevail on a motion for a new trial under Rule 33, the Kims must satisfy the following five-part test:
 
 
 32
 (1) the evidence must be newly discovered,
 
 
 33
 (2) the Kims' failure to discover the evidence sooner must not be due to their lack of diligence,
 
 
 34
 (3) the evidence must be material to the issues at trial,
 
 
 35
 (4) the evidence must be neither cumulative nor merely impeaching, and
 
 
 36
 (5) the evidence must be such that a new trial would probably result in acquittal.
 
 
 37
 See Reyes-Alvarado, 963 F.2d at 1188. Moreover, a district court's denial of a motion for new trial should be reversed only in exceptional circumstances where the evidence weighs heavily against the verdict. United States v. Chen, 754 F.2d 817, 821 (9th Cir.), cert. denied, 471 U.S. 1139 (1985).
 
 
 38
 The newly discovered evidence that is the basis for the Kims' motion for a new trial consists primarily of affidavits by Kap Soo Kim, Scott Lee, and Chong Kim. Kap Soo Kim's affidavit states that he made payments to Ann Kim in late 1989 in amounts ranging between $1,000 and $3,000 to repay a $20,000 loan that Ann Kim had made him. These payments would explain some of the transactions that the government linked to the narcotics conspiracy. Kap Soo Kim's affidavit also states that Kwang Sun Kim admitted to Kap Soo Kim that Keith Kim knew nothing about the illegal shipments. Scott Lee and Chong Kim's affidavits recount conversations that each had with Yong Sul Kim in Korea. In each, Yong Sul Kim purportedly stated that because he was nervous, he had lied to government agents regarding his financial relationship with Keith Kim. He allegedly stated that the $120,000 that Ann Kim delivered to his daughter in Los Angeles was his own and had no connection with Keith Kim.
 
 
 39
 These affidavits do not meet the five-part test. The hearsay statements recited in Scott Lee and Chong Kim's affidavits are not reliable enough that they would have probably resulted in an acquittal. Likewise, Kap Soo Kim's statement that he was repaying a $20,000 loan to Ann Kim would not have produced an acquittal because the testimony does not explain the $120,000 cash deposits Ann Kim made into Acme's corporate account, the repeated mistakes in accounting for the Joo Hun Lee imports, or Ann Kim's presence and powdered thumb at Acme on the night of her arrest. Further, Kap Soo Kim's hearsay statement that Kwang Sun Kim told him that Keith Kim was not involved in the conspiracy was merely impeaching and would not have produced an acquittal. Accordingly, we conclude that the district court did not abuse its discretion in rejecting the Kims' motion for a new trial based on newly discovered evidence. See Reyes-Alvarado, 963 F.2d at 1188.
 
 
 40
 B. The District Court Properly Ruled that Ineffective Assistance of Counsel Claims Should be Pursued Collaterally.
 
 
 41
 In the context of their motion for a new trial, the Kims asked the district court to address the ineffectiveness of their trial counsel. The Kims recognized below and on appeal that the proper method of litigating claims of ineffective assistance of counsel is by collateral attack of their convictions under 28 U.S.C. § 2255. See United States v. Wagner, 834 F.2d 1474, 1482 (9th Cir.1987). We can review ineffective assistance of counsel claims on direct appeal only if the record is sufficiently complete, United States v. Molina, 934 F.2d 1440, 1446 (9th Cir.1991), or if the representation at trial "was so inadequate as obviously to deny [a defendant] his Sixth Amendment rights." Wagner, 834 F.2d at 1482. The Kims' claim does not meet either standard.
 
 
 42
 The district court recognized that it could grant relief, but chose not to, stating:
 
 
 43
 it is not apparent to me that either Mr. Mathews or Mr. Yamaki didn't know what they were doing in this case.... As I saw them perform in a fairly substantial trial and pretrial context, I am not moved, by the record in front of me, to throw out everything that has been done, in the sense that it screams out for relief; it doesn't. I don't have insight into the various decisions that were made by both of those gentlemen in regards to trial tactics, and I do agree with the government that this is not the forum....
 
 
 44
 We agree with the district court. The record of the Kims' trial counsel's actions and tactics is not adequate. Moreover, we find that the Kims' trial counsel's representation was not "obviously inadequate." Accordingly, we conclude that the district court did not abuse its discretion in failing to address the Kims' ineffective assistance of counsel claim in the context of their motion for a new trial.
 
 
 45
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3