**UNITED STATES of America, Appellee,**

v.

**Stuart Kenton SKARDA, Appellant.**

**No. 87–5288.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 8, 1988.

Decided May 9, 1988.

Paul A. Sortland, Fargo, N.D., for appellant.

Dennis D. Fisher, Asst. U.S. Atty., Fargo, N.D., for appellee.

Before HEANEY and BOWMAN, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.[*]

BOWMAN, Circuit Judge.

Stuart Kenton Skarda appeals his convictions on counts of bank robbery, assault, hostage taking, and possession of a firearm by a felon, all in connection with the February 1987 robbery of the Drayton State Bank in Drayton, North Dakota. We affirm.

I.

The story of the Drayton bank robbery begins in January 1987. For most of that month, Skarda had been driving around the Midwest with two companions, Cynthia Ehrlich and her boyfriend Thomas Harrelson. Harrelson was one of the FBI's ten most wanted criminals. He could not walk without crutches, having shot himself in the knee after robbing a bank in Little Rock, Arkansas in early January. Skarda and Ehrlich drove Harrelson north from the Little Rock area. The trio traveled for more than a month through several midwestern states, unsuccessfully seeking a doctor who would tend to Harrelson's gun-

shot wound without telling the police. When they had spent nearly all of the twelve or thirteen thousand dollars stolen from the Little Rock bank, they decided to rob the Drayton bank in the northeast corner of North Dakota.

At about 2:00 p.m. on February 19, the three fugitives drove into Drayton and stopped near the bank. Ehrlich took a 9 mm handgun and a duffel bag with a demand note taped to the end and entered the Drayton State Bank. The teller read the note, saw the gun, and put $2,807.00 in the bag. Ehrlich then left the bank to rejoin Harrelson and Skarda, who were parked about a block away. The bank president followed Ehrlich outside and chased her down an alley toward the getaway car. Ehrlich turned and pointed the gun at the president, ordering him to go back. However, as soon as Ehrlich pulled away with Harrelson and Skarda, the bank president gave chase in a car volunteered by a local resident. During the high-speed chase, Skarda gave each accomplice some money from the duffel bag in case the band got separated.

Just east of Drayton, over the Minnesota state line, the robbers' car ran into a ditch. The bank president drove by and called the police from a nearby farm. In the meantime, Skarda left the stranded car and eventually waved down a loaded grain truck. Driving the truck was Clayton Pokrzywinski, with his wife, Janet, and their two granddaughters, aged six months and three years. Skarda climbed into the cab and persuaded the Pokrzywinskis to take him back to his friends to pull their car out of the ditch. The Pokrzywinskis agreed to help Skarda, and they sensed no danger until after they stopped to pick up Ehrlich and Harrelson. At that point, as a police car appeared in the distance, Harrelson brandished a handgun and ordered Mr. Pokrzywinski to drive the three robbers out of the area. Skarda, Harrelson, and Ehrlich ignored Mrs. Pokrzywinski's pleas to be let out with the children. The seven

---

[*] The HONORABLE THOMAS E. FAIRCHILD, Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.

people in the crowded truck swerved through two incomplete roadblocks and fled for nine miles before the police could shoot out the rear tires of the truck and force it off the road. As the truck stopped, the farm couple and the infants exited through the driver's door, and Skarda, Harrelson, and Ehrlich jumped out the passenger side. Two sheriff's deputies saw Skarda and Harrelson crouch in the snow as they left the truck and before they turned to flee. After they captured the three robbers, the police found two handguns—a 9 mm and a .22 caliber pistol—in the snow where Skarda and Harrelson had crouched beside the truck. Skarda tried to hide his wallet and identification under the seat of the squad car, and told the police his name was Smith. The police searched Skarda and found in his pocket a box of fifty live cartridges for a .22 caliber weapon, along with $300.01.

Before Skarda's trial, Ehrlich pleaded guilty and agreed to cooperate as a witness for the government. Her testimony provided direct evidence of Skarda's knowledge of and active participation in the Drayton bank robbery. Harrelson likewise pleaded guilty, but was not asked to testify for the government. Instead, he testified for the defense, insisting, contrary to Ehrlich's testimony, that Skarda had nothing to do with the Drayton bank robbery. Harrelson said that Skarda decided to travel with him and Ehrlich as a vacation, and to help out with the luggage because of Harrelson's crippled leg. Harrelson testified that Skarda knew nothing of the robbery plans, that he was asleep on the back seat of the car when Ehrlich got out to rob the Drayton bank, and that he was not fully aware of what had happened until after his arrest. Skarda did not testify.

The three-day jury trial began April 27, 1987; deliberations ran from April 29 into the following afternoon. The jury—having been instructed on a theory of aiding and abetting—found Skarda guilty of bank robbery, two counts of assault (on the bank teller and bank president), and of hostage taking in the course of the robbery. He also was found guilty of being a felon in possession of a firearm. Skarda was ac-

quitted on one count of assault on a bystander, a man who happened to be in the alley when Ehrlich pointed her gun at the bank president.

For reversal, Skarda raises the following issues: (1) that the prosecution made an improper closing argument, placing the credibility of the government at issue; (2) that the prosecution, in closing argument, raised new issues on rebuttal and referred to matters not in evidence; (3) that the prosecution violated the local rule against splitting the closing argument and rebuttal between two different attorneys; (4) that the trial court erred in providing additional instructions to the jury that tended to favor the prosecution without giving countervailing instructions on behalf of the defendant; and (5) that the evidence was insufficient to support the verdict, especially as to the charge of hostage taking. After thoroughly studying the entire record, we find that only the first and fourth issues require discussion.

## II.

■ Skarda contends that he was denied a fair trial because counsel for the United States improperly put the prosecutors' and the government's integrity in issue during closing argument. In the rebuttal portion of the government's closing argument, an assistant United States attorney accused the defense counsel of attacking the prosecution itself, rather than the prosecution's witnesses. "Cindy Ehrlich, according to [defense counsel's] theory, really has no reason whatsoever to lie unless we want her to lie. What is our motive? ... We are doing the best we can to convict someone that obviously we feel in good faith should be prosecuted and convicted." *United States v. Skarda*, No. C2–87–22–02, Transcript at 419–20, (D.N.D. April 27–29, 1987) (Tr.). Such comments are clearly improper. *See, e.g., United States v. Splain*, 545 F.2d 1131, 1134 (8th Cir.1976) (prosecutor committed error in stating: "We are trying to convict [the defendant] because he committed a crime and we are convinced of that or we wouldn't be trying him."). *See also* A.B.A. Standards for Criminal Justice 3–5.8

(2d ed. 1980) ("Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued.").

The government argues that improper attacks by defense counsel during trial and in closing argument initially put the prosecutor's integrity at issue, and "invited" the response by the prosecution. *See United States v. Young,* 470 U.S. 1, 11–20, 105 S.Ct. 1038, 1044–48, 84 L.Ed.2d 1 (1985); *Lawn v. United States,* 355 U.S. 339, 359–60 n. 15, 78 S.Ct. 311, 323 n. 15, 2 L.Ed.2d 321 (1958). We disagree. The personal attacks complained of by the prosecution were aimed primarily at the credibility of Cindy Ehrlich, not at the integrity of the government. For instance, the government refers to three passages where Skarda's attorney "strongly suggested that the prosecutors had suborned perjury [from Ehrlich]. (T. 187, 194, 235)." Appellee's Brief at 10. The three references are to portions of the defense's cross-examination of Ehrlich. Page 187 includes the question: "It wasn't until you were engaged in plea negotiations with the Government's attorney here that you came out with a much more full-fledged story implicating Skarda, isn't that true?" At page 194: "You didn't go over that very carefully with the prosecuting attorneys, did you?" And at page 235: "Did you possibly say that to [the prosecutor] because you are concerned about the sentencing you might get now?" In addition, during closing argument defense counsel blamed the prosecutors for "attempting to skew the evidence" against Skarda. Tr. at 414. These questions and comments cannot be viewed as justification for the prosecutor's response. Indeed, far harsher verbal attacks by defense counsel in other cases have been held not to excuse improper prosecutorial responses. *See, e.g., Young,* 470 U.S. at 4–5, 105 S.Ct. at 1040 (defense counsel called government's tactics "reprehensible" and "poison[ous]," and implied that prosecutor had not "acted with honor or with integrity"); *United States v. O'Connell,* 841 F.2d 1408, 1429 n.

19 (8th Cir.1988) (defense counsel called prosecutor's tactics "unfair," "wicked," and "poison[ous]"). We are unable to find anything in the record that would justify the assistant United States attorney's improper comments. We conclude that the improper prosecutorial comments at issue in this case cannot be excused as invited error.

■ Appellant must demonstrate not only that the prosecutor's remarks were improper, but also that the improper remarks prejudicially affected his substantive rights. *United States v. Boyce,* 797 F.2d 691, 694 (8th Cir.1986). Because Skarda's attorney failed to object to the remarks in question, we review the matter under the plain error rule, Fed.R.Crim.P. 52(b), to determine whether the remarks were "such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *O'Connell,* at 1429 (quoting *Young,* 470 U.S. at 16, 105 S.Ct. at 1047). We conclude that the prosecutor's improper remarks did not render Skarda's trial fundamentally unfair. The improper remarks were made in one brief portion of the closing argument and were not repeated or referred to again. In the totality of the circumstances they amount to only an insignificant blemish on what otherwise was an entirely fair proceeding. *See, e.g., United States v. Andrade,* 788 F.2d 521, 531 (8th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986). The remarks were not made until after the jury had heard a powerful case with strong evidence against the defendant (*e.g.,* an eyewitness account of Skarda's criminal involvement, evidence of his key role in hijacking the grain truck, his possession of live ammunition upon his capture, his attempt to hide his wallet and his identity from the police). *See, e.g., Splain,* 545 F.2d at 1135. The record points to no "miscarriage of justice" resulting from the improper prosecutorial comments.

### III.

Skarda attacks the trial judge's responses to four specific questions submitted to the District Court by the jury during their

deliberations.[1] Although Skarda does not contend that the supplemental instructions, given by the court over his objection in response to these questions, were legally incorrect, he argues that they favored the government by improperly emphasizing the prosecution's case. Skarda therefore insists that the trial court should not merely have answered the jury's particular questions, but also should have "repeated [the original] instructions ... favorable to the defendant." Brief of Appellant at 19.

"When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946). "The response to a jury request for supplemental instructions is a matter within the sound discretion of the district court." *United States v. White*, 794 F.2d 367, 370 (8th Cir.1986). *Accord United States v. Humphrey*, 696 F.2d 72, 75 (8th Cir.1982), *cert. denied*, 459 U.S. 1222, 103 S.Ct. 1230, 75 L.Ed.2d 463 (1983); *United States v. Neiss*, 684 F.2d 570, 572 (8th Cir.1982).

A trial judge must be painstakingly impartial any time he communicates with the jury during deliberations. He must insure that any supplemental instructions are accurate, clear, neutral, and non-prejudicial. *Compare United States v. Felak*, 831 F.2d 794, 798 (8th Cir.1987) (supplemental instructions re-explaining essential elements of government's case, but not defense theory, were properly "responsive to the jury's inquiry"); and *Humphrey*, 696 F.2d at 75 (supplemental instruction defining possession was proper because it was "favorable neither to the government nor to appellants"); *with United States v. Carter*, 491 F.2d 625, 630–34 (5th Cir.1974) (judge improperly answered jury's request for supplemental instruction on circumstantial evidence with two ad-libbed hypotheticals involving guilty defendants, and an incomplete explanation of the presumption arising from possession of stolen property); and *Perez v. United States*, 297 F.2d 12,

14–16 (5th Cir.1961) (judge improperly offered supplemental instructions that contradicted original instructions and suggested that defendant had burden of proving innocence). Skarda cites one case, *Bland v. United States*, 299 F.2d 105 (5th Cir. 1962), to support his argument for countervailing instructions. *Bland* is inapposite, however, because the supplemental instruction there at issue, while technically responsive to the jury's question, was obviously incomplete and misleading, and thus prejudicial to the defendant. *Id.* at 108.

In the case before us, Skarda does not seriously argue that any of the four supplemental instructions were incorrect. The trial judge provided specific, neutral instructions that replied clearly and precisely to the jury's questions. Skarda's argument is that the trial judge had a duty to reiterate instructions favorable to the defense. We rejected this "inflexible re-reading requirement" under similar circumstances in *Humphrey*, 696 F.2d at 75. Instead, the matter is one committed to the sound discretion of the trial court. Although we note that the trial judge would have done well to remind the jury to consider the supplemental instructions in the context of all the original instructions, *see, e.g., United States v. Piatt*, 679 F.2d 1228, 1231 (8th Cir.1982), we hold that in the present case the trial court did not abuse its discretion by giving supplemental instructions without repeating the original instructions favorable to the defense.

## IV.

We have carefully considered Skarda's other grounds of appeal and find them to be without merit. Accordingly, we affirm his convictions.

---

**1.** The jury requested these additional instructions: (1) the definition of interstate commerce; (2) the definition of possession of a handgun, especially vicarious control; (3) whether three charges of assault on the bank teller, the president of the bank, and a bystander should be considered separately; and (4) when is the crime of robbery completed?