**UNITED STATES of America, Appellee,**

v.

**Florence L. JONES, also known as Florence Roulette, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Arthur W. HOOKS, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Eric Wayne TRAVIS, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**James E. ROULETTE, III, Appellant.**

**Nos. 91–1987, 91–2008, 91–2083, 91–2091.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 11, 1991.

Decided June 9, 1992.

Rehearing Denied July 17, 1992.

Rehearing and Rehearing En Banc Denied in No. 91–2091 Aug. 11, 1992.

1508

Larry C. Pace, Kansas City, Mo., argued, for appellant Florence Jones.

Timothy R. Brownlee, Kansas City, Mo., argued, for appellant Arthur Hooks.

John R. Cullom, Kansas City, Mo., argued, for appellant Eric Travis.

James Bandy, Kansas City, Mo., argued, for appellant James Roulette.

Marietta Parker, Kansas City, Mo., argued, for appellee.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Eric Wayne Travis, James E. Roulette, III, Florence L. Jones and Arthur W. Hooks appeal their convictions of conspiracy to distribute cocaine base (crack), distributing crack, and other related offenses and the heavy sentences imposed on them (Travis—life in prison without parole; Roulette—forty-four years seven months in prison; Jones—fifteen years eight months in prison; Hooks—ten years in prison). Appellants raise numerous arguments which we discuss in the body of this opinion. We are obliged to affirm, except that we vacate and remand Hooks's sentence, No. 91–2008, and, in an addendum, the writer recommends en banc review of Roulette's sentence, No. 91–2091.

Collectively, appellants argue that the district court deprived them of a fair trial because: (1) the district court erred in denying defendants a public trial by placing a screen obstructing the public's view of a Government witness; (2) the district court erred in failing to excuse a juror because her husband spoke with a Government witness; (3) the district court erred in denying appellants the opportunity to cross-examine informant Ivan Sanders regarding a prior arrest; (4) the district court erred in permitting the prosecutor to make prejudicial remarks to the jury in closing arguments; and (5) the district court erred in permitting the Government to introduce evidence pertaining to conduct of Hooks and Roulette that occurred before the time alleged in the indictment for conspiracy.

Arthur W. Hooks argues that he should be resentenced because the Government presented insufficient evidence connecting him to a conspiracy to distribute at least fifty grams of crack.

James E. Roulette, III, argues: (1) the Government presented insufficient evidence to convict him of one of his firearm-drug trafficking counts; (2) the district court improperly applied the Sentencing Guidelines (United States Sentencing Commission, *Guidelines Manual* (Nov.1990) [hereinafter U.S.S.G.]) in calculating Roulette's sentence; (3) the district court erred in giving him an additional twenty-year sentence for twice violating 18 U.S.C.A. § 924(c) (West Supp.1991).

Eric Wayne Travis argues that he deserves a new trial because the district court erred in improperly admitting testimony referring to an incriminating statement of a non-testifying co-conspirator, in violation of the *Bruton* rule. Travis also appeals his mandatory minimum sentence of life in prison without parole, arguing that it constitutes cruel and unusual punishment.

Florence Jones argues that she should be resentenced because the Sentencing Guidelines violate her fifth amendment due process rights.

## I. BACKGROUND

The Government indictment charged twelve counts as follows:

1. Beginning on February 15, 1990, Travis, Roulette, Jones and Hooks conspired to distribute more than fifty grams of crack in violation of 21 U.S.C.A. §§ 841(a)(1), (b)(1)(A), 846 (West Supp.1991).

2. Roulette and Jones sold more than five grams of crack on April 27, 1990 in violation of 21 U.S.C.A. § 841(a)(1), (b)(1)(A).

3. On May 2, 1990, Roulette sold more than fifty grams of crack in violation of 21 U.S.C.A. § 841(a)(1), (b)(1)(A).

4. On May 11, 1990, Roulette sold more than five grams of crack in violation of 21 U.S.C.A. § 841(a)(1), (b)(1)(B).

5. On May 11, 1990, Roulette used a firearm in relation to a drug trafficking crime in violation of 18 U.S.C.A. § 924(c) (West Supp.1991).

6. On May 30, 1990, Travis and Roulette sold more than fifty grams of crack in violation of 21 U.S.C.A. § 841(a)(1), (b)(1)(A).

7. On May 30, 1990, Travis and Roulette possessed with intent to distribute more than fifty grams of crack in violation of 21 U.S.C.A. § 841(a)(1), (b)(1)(A).

8. On May 30, 1990, Travis and Roulette used two firearms in relation to a drug trafficking crime in violation of 18 U.S.C.A. § 924(c).

9. On May 30, 1990, Travis, being a person convicted of two prior felonies, did possess two firearms in violation of 18 U.S.C.A. §§ 922(g), 924(a)(2).

10. From April 27, 1990 until May 30, 1990, Jones maintained a place for the purpose of distributing crack in violation of 21 U.S.C.A. § 856(a).

11. On May 1, 1990, Hooks sold crack in violation of 21 U.S.C.A. § 841(a)(1), (b)(1)(C).

12. On May 10, 1990, Hooks sold crack in violation of 21 U.S.C.A. § 841(a)(1), (b)(1)(C).

At trial, the Government presented the following version of the facts to the jury:

In mid-March 1990, Ivan Sanders called the Drug Enforcement Unit of the Kansas City Police and told them he wanted to turn in a drug house. Sanders admitted to police that he had used crack, but now wanted to come clean. On April 27, 1990, Sanders contacted Kansas City narcotics detective Ray Tisinger and told him that a Los Angeles gang member known as "Big Daddy" was delivering large quantities of crack to a James Roulette in Kansas City.

Later, on April 27, Tisinger and Sanders reached Roulette by his pager and offered to purchase a one-half ounce of crack from Roulette at his residence, 1008 East 26th Street, Apartment 1, in Kansas City. When they traveled to Roulette's apartment, Florence ·Jones, Roulette's mother, met them at the door and showed them into the living room, where they waited for

Roulette. When Tisinger paid with police funds for the 14.35 grams of crack he received from Roulette, Jones provided Tisinger with change.

On May 2, 1990, Tisinger met with Roulette in his car at 33rd Street and Agnes Avenue and bought 57.08 grams of crack from Roulette for $2,700.

On May 11, 1990, Tisinger and Sanders went to Roulette's residence after Roulette told Sanders he had large quantities of crack to sell. Roulette led them to his bedroom, where they encountered two men who appeared to be Roulette's bodyguards. After disagreeing about the terms of their deal, Roulette picked up a 9–millimeter automatic pistol, loaded it and aimed it in Tisinger's direction. Tisinger and Sanders agreed to pay $1,300 for one ounce of crack and Roulette gave them twenty-six grams. Sanders and Tisinger also witnessed a .357 magnum pistol lying on the bed next to Roulette.

On May 29, 1990, Roulette contacted Sanders and told him that "Big Daddy" would be in town bringing large quantities of crack and Sanders arranged to meet with Roulette the next day.

Tisinger and Sanders arrived at Roulette's apartment on May 30, 1990 at 11:30 a.m. Florence Jones greeted them and observed while Tisinger purchased 52.37 grams of crack from Roulette in the living room for $2,700. Roulette led Sanders to his bedroom and Sanders observed "Big Daddy," also known as Eric Wayne Travis, counting the money Roulette had received from Tisinger.

On May 30, 1990, at 3:30 p.m., Kansas City police arrested Roulette in his car. At 5:30 p.m., Kansas City police executed a search warrant for Roulette's residence. Inside, police found Jones and Travis and some other buyers. Travis requested a shirt and shoes from a British Knights bag in the bedroom. A search of the bedroom revealed, lying next to the British Knights bag, a plastic Marriott bag with Travis's fingerprint on it containing forty smaller bags holding 1,052.50 grams of crack, $7,715 lying on the bed, a Fendi brand suitcase claimed by Roulette containing $1,700, a scientific scale, a loaded .357 magnum pistol and a loaded 9–millimeter automatic pistol.

After his arrest, Roulette talked to Kansas City police detective Robert Starbuck after acknowledging his *Miranda* rights and signing a waiver. Roulette detailed to police his own drug dealing and his relationship with Travis. He stated that Travis visited Kansas City from Los Angeles, bringing large quantities of crack. Roulette stated he sold the crack for Travis, gave Travis the money he received and Travis then paid him for his "assistance." Despite confessing, Roulette later denied his guilt of the charged offenses to police and to the probation officer.

Earlier, Sanders and Tisinger did related business with Arthur Hooks. Sanders had moved in with Hooks in November 1989 after his mother had thrown him out of her house for using drugs. Sanders testified at trial that he overheard a conversation in November 1989 between Roulette and Hooks during which Hooks agreed that Roulette could sell crack at his house, at 2812 East 33rd Street in Kansas City. Shortly after that conversation, Roulette moved in with Hooks. Sanders stated he observed that between December 1989 and February 1990 Travis visited Roulette at Hooks's residence twice. During Travis's visits to Hooks's residence, Travis and Roulette "cut up" large quantities of crack in Sanders's presence. Sanders testified that beginning in February 1990 Roulette brought a total of twenty "rocks" of crack, probably weighing two grams at most, to Hooks and Sanders for them to sell. Sanders smoked one-half of the crack with Hooks and they sold the rest.

On May 1, 1990, Tisinger and Sanders visited Hooks to purchase crack. Hooks instructed an associate named "Jay" to arrange a purchase and "Jay" sold Tisinger three "rocks" weighing .30 grams for $60. On May 10, 1990, Tisinger visited Hooks and again purchased three "rocks" weighing .20 grams for $60.

The district court tried the four defendants in a joint trial that began on November 5, 1990. Tisinger and Sanders testified

as to the facts described above. On November 13, 1990, the jury convicted the defendants on all counts except that it acquitted Travis of count IX, using a firearm during a drug trafficking crime on May 30, 1990. The district court sentenced Travis to life in prison, Roulette to forty-four years seven months, Jones to fifteen years eight months and Hooks to ten years.

## II. DISCUSSION

### A. Screen of Witness

Appellants argue that the district court deprived them of their right to a public trial by screening Detective Tisinger's identity from the public during his testimony.

At trial, the Government sought to protect Detective Tisinger's identity, arguing that the use of a screen was necessary to protect his personal safety. Captain James Nunn, commander of the Drug Enforcement Unit of the Kansas City Police Department, testified that if the identity of Tisinger became known on the streets of Kansas City, his safety would be compromised. Nunn stated that, although Tisinger had testified publicly at other proceedings, associates of Roulette had already brutally beaten Ivan Sanders, suggesting that Tisinger was at risk as well. The Government moved to shield Tisinger's identity from the public by screens during trial, but also requested that persons with press credentials be permitted to have an unobstructed view of Tisinger's testimony. The district court granted the Government's motion.

■ We review the district court's ruling under the abuse of discretion standard. *United States v. Lucas*, 932 F.2d 1210, 1217 (8th Cir.1991). Appellants argue that the record does not support screening Tisinger's identity because Tisinger has appeared in court in the past. We disagree. Considering the evidence of the risk to Tisinger's life in this case before the district court, we find no abuse of discretion in its conclusion to use a screen during Tisinger's testimony.

### B. Juror Prejudice

■ Appellants argue they were unduly prejudiced by the district court's failure to excuse a juror. During trial, the husband of juror Nora Goecher sat next to one of the Government's witnesses, a Kansas City police detective, and discussed procedures of juror selection with the detective. Defense counsel observed this and asked the district court to replace Goecher with an alternate. The district court called Mr. Goecher to the bench and asked him whether he had discussed the trial at all with his wife. Mr. Goecher denied doing so. The district court reminded Mr. Goecher not to speak with his wife at all about his conversations with the detective, or the trial, and denied appellants' motion to remove Goecher as a juror.

Appellants argue the district court abused its discretion by failing to investigate whether juror Goecher was improperly prejudiced by her husband's conduct. We review district court decisions regarding improper jury communications under the abuse of discretion standard. *United States v. Conners*, 894 F.2d 987, 992–93 (8th Cir.1990). Our review of the record reveals no evidence that juror Goecher was ever prejudiced by her husband's communication with a Government witness. We reject this ground for appeal.

### C. Impeachment of Government Witness

■ Before the district court discharged Ivan Sanders as a witness at trial, the Government provided appellants with a police report detailing Sanders's arrest on April 18, 1990 for outstanding traffic tickets. The Government moved in limine to exclude the police report, or any mention of Sanders's arrest, from trial. The district court granted the Government's motion. Appellants argue they should have been able to impeach Sanders with the police report. However, Sanders's arrest was for violations of municipal ordinances punishable by no more than six months in prison. Sanders's traffic violations did not involve dishonesty or false statements. Therefore, under Federal Rule of Evidence 609, Sand-

ers's arrest was clearly inadmissible for purposes of impeachment. *United States v. Nichols*, 808 F.2d 660, 664 (8th Cir.), *cert. denied*, 481 U.S. 1038, 107 S.Ct. 1976, 95 L.Ed.2d 816 (1987).

### D. Prosecution Remarks

Appellants allege that the prosecutor made prejudicial statements during the rebuttal portion of her closing argument. The remark by the prosecutor, which concerns this court the most, occurred in response to defense counsel's allegation during closing arguments that the prosecutor made "unfair" assessments of the evidence in her summation:

> Now, before I go into answering more of the specifics of the issues raised, I do want to start out by saying that Mr. Bandy made a couple of statements about whether or not I was being fair. I want to address those first because I take those kind of comments very seriously and very personally. When a person is sworn in as an Assistant United States Attorney, they take an oath of office that they will do justice, they won't seek a conviction, they will do justice and try to be fair.

VI Trial Transcript at 1149 [hereinafter — Tr. at —].

The prosecutor clearly made improper remarks. *See, e.g., United States v. Skarda*, 845 F.2d 1508, 1510 (8th Cir.1988) (prosecutor erred by stating: "We are doing the best we can to convict someone that obviously we feel in good faith should be prosecuted and convicted."). The prosecutor went too far in arguing her own credentials for truthfulness to the jury.

The district court overruled defense counsel's objections to those remarks, stating that the remarks were invited. The Government points to sections of Roulette's counsel's arguments in which Roulette's counsel stated that the prosecutor made an "unfair" argument by referring to Eric Travis as a drug supplier. VI Tr. at 1107. Although a district court may permit many otherwise erroneous statements by prosecutors as "invited responses" to remarks by defense counsel, *United States*

*v. Young*, 470 U.S. 1, 12–14, 105 S.Ct. 1038, 1044–46, 84 L.Ed.2d 1 (1985), the Court in *Young* held that statements of defense counsel far harsher than the statements in this case do not excuse misconduct. 470 U.S. at 4–5, 105 S.Ct. at 1040–41 (defense counsel called government's tactics "reprehensible" and implied prosecutor had not "acted with honor or integrity"—no invited error); *see also Skarda*, 845 F.2d at 1511 (defense counsel suggested that prosecutors had suborned perjury—no invited error); *United States v. O'Connell*, 841 F.2d 1408, 1429 n. 19 (8th Cir.1988) (defense counsel called prosecutor's tactics "wicked" and "poisonous"—no invited error), *cert. denied*, 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989). Defense counsel's remarks did not invite the erroneous statements made by the prosecutor.

Appellants must not only prove that the prosecutor's remarks were improper, but that they also prejudicially affected their substantive rights. *United States v. Boyce*, 797 F.2d 691, 694 (8th Cir.1986). We conclude that the improper remarks did not prejudice appellants' trial. The prosecutor made her remarks at the end of a trial in which the Government presented overwhelming evidence against appellants. If the Government's case were not as strong, we might have concluded otherwise.

### E. Roulette's Firearm Conviction

Roulette argues the Government presented insufficient evidence to convict him of count VIII, using a firearm in relation to a drug trafficking crime on May 30, 1990, in violation of 18 U.S.C.A. § 924(c)(1) (West Supp.1991). Roulette argues that he could not have been "using" the two guns found in his bedroom for drug trafficking because he was not in the house when police arrested him. Reading the evidence in a light reasonably favorable to the Government, we reject this argument. Sanders and Tisinger testified at trial that Roulette owned both the guns found in his bedroom on May 30 lying beside large amounts of drugs. A defendant need not hold, display, brandish or discharge a weap-

on to be guilty of "using" a weapon under 18 U.S.C.A. § 924(c)(1). "[T]he mere presence and ready availability of a firearm at a house where drugs are dealt constitutes the 'use' of a gun during a narcotics offense." *United States v. Drew*, 894 F.2d 965, 968 (8th Cir.), *cert. denied*, 494 U.S. 1089, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990). In this case, the jury had evidence that Roulette dealt drugs out of his bedroom, that the guns in his bedroom were in his possession and control and that Roulette used the guns during commission of a drug trafficking crime.

### F. Travis's *Bruton* Issue

At trial, Detective Robert Starbuck testified on direct examination about Roulette's confession. Specifically, Starbuck stated that Roulette told him that he dealt crack out of the bedroom in the northwest corner of his apartment. During cross-examination of Starbuck, Florence Jones's counsel asked Starbuck:

Q: And James [Roulette] told you, did he not, that when Eric [Travis] came into town that Eric would stay in James' bedroom in the northwest corner of the apartment.

A: Yes.

IV Tr. at 915.

Travis's counsel objected after Starbuck answered the question. The district court denied Travis's counsel's motion for a mistrial and for severance. The district court later instructed the jury to disregard any descriptions of statements by Roulette that would tend to incriminate Travis.

Travis argues that the district court committed prejudicial error by refusing to declare a mistrial after Detective Starbuck described a statement by Roulette that implicated Travis by name. In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Court held that the sixth amendment confrontation clause precludes admission in a joint trial of the powerfully incriminating statements of a co-defendant not subject to cross-examination. *Id.* at 137, 88 S.Ct. at 1628–29. A defendant is deprived of his rights under the confrontation clause "when his nontes-

tifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 201–02, 107 S.Ct. 1702, 1704–05, 95 L.Ed.2d 176 (1987). Travis objects to the admission of Roulette's statement, through Starbuck, that Travis stayed in the bedroom in the northwest corner of the apartment, where police later found drugs and firearms. We agree that Travis's name should not have appeared in Starbuck's description of Roulette's confession. However, a *Bruton* error does not require reversal if the error was harmless beyond a reasonable doubt. *United States v. Donahue*, 948 F.2d 438, 444 n. 5 (8th Cir.1991). Overwhelming evidence already introduced at trial linked Travis to the bedroom in Roulette's apartment. Sanders testified that on May 30, 1990 he observed Travis sitting on the bed in the northwest corner of Roulette's apartment and that drugs lay on the bed beside Travis. IIA Tr. at 371–73. Police also recovered Travis's shoes and travel bag from the same bedroom. IIIA Tr. at 563–64. Therefore, Roulette's statement implicating Travis was cumulative and did not add to the evidence that already incriminated Travis. Any error the district court committed in handling Starbuck's testimony was harmless beyond a reasonable doubt.

### G. Pre–Conspiracy Acts

Appellants Hooks and Roulette challenge the admissibility of Sanders's testimony regarding actions by Hooks and Roulette that occurred before February 15, 1990, the date the indictment alleges the conspiracy began. Sanders described a conversation that took place between Hooks and Roulette in November 1989 in which Hooks allegedly agreed to sell drugs out of his house for Roulette. IIA Tr. at 335. A court may admit pre-conspiracy evidence when the evidence establishes the motive or intent of the conspirators, is clear and convincing, is more probative than prejudicial, is not so far removed in time as to make it inadmissible under Federal Rule of

Evidence 404(b) and when the court gives an instruction to the jury as to the narrow purpose for which the evidence may be considered. *United States v. McConnell,* 903 F.2d 566, 572 (8th Cir.1990). Because Sanders's testimony established Roulette's and Hooks's intent to conspire, was not far removed in time from the actual conspiracy, was clear and convincing, was highly probative, and was accompanied by an appropriate limiting instruction, the district court properly admitted Sanders's testimony about pre-conspiracy activities.

### H. Hooks's Sentence

The district court sentenced Hooks to the mandatory minimum sentence of ten years without parole for conspiracy to distribute at least fifty grams of crack, under 21 U.S.C.A. § 841(b)(1)(A) (West Supp.1991). Hooks appeals his sentence, arguing that the district court erred in finding that he participated in a conspiracy to distribute at least fifty grams of crack. Hooks argues that he should be sentenced based on the amounts of crack that he actually sold, which amounted to no more than a few grams, and not for the large amounts (1.2 kilos) of crack possessed and sold by Travis, Roulette and Jones at 1008 East 26th Street in Kansas City.

The probation officer concluded in Hooks's Presentence Investigation Report (PSR) that Hooks could not be tied to more than the .5 grams that he actually sold to Detective Tisinger, and assessed his base offense level at 16 and his sentencing range at one year nine months to two years three months. At sentencing, the Government challenged the PSR's findings, arguing that it presented sufficient evidence at trial proving that Roulette's large crack deals were reasonably foreseeable to Hooks. The district court agreed with the PSR's conclusion, but felt it was bound by the jury's verdict to give Hooks the mandatory minimum sentence of ten years for conspiring to distribute at least fifty grams of crack.[1]

However, we observe that the jury did not specify what quantity of crack Hooks was guilty of conspiring to distribute. Although the district court read the indictment to the jury, in which the Government alleged that Hooks conspired to distribute at least fifty grams of crack, the district court gave the jury a generic conspiracy instruction and did not require the jury to link Hooks to a specific quantity of crack to convict him of conspiracy. After a guilty verdict, the district court must determine whether the mandatory penalties of section 841(b)(1)(A) apply by finding by a preponderance of the evidence the quantity of drugs a defendant possessed, distributed or conspired to distribute. *See United States v. Wood,* 834 F.2d 1382, 1388–90 (8th Cir. 1987). Therefore, the district court was free to adopt the PSR's quantity determination in sentencing Hooks.[2]

---

1. The district court stated in its findings:

 I am going to rule that the probation office probably assessed the quantity of cocaine against the defendant. I am aware, of course, since I conducted the trial, that the jury found this man guilty of a conspiracy. But he was, in the Court's opinion, a small player in that conspiracy. Mr. Hooks, the biggest problem was, that he kept consuming the product. He couldn't keep his hands out of it to sell it. And I think the jury verdict should stand as to Count I in addition to Counts XI and XII, but the probation office I rule has properly assessed the amount of cocaine, the crack cocaine that should be assessed against this defendant in computing his sentence....

 ....

 The applicable guidelines as determined by the presentence shown on page 9 that the total offense level is 16. Page 10 indicates a criminal history category of 1 for a range of punishment of 21 to 27 months. But Count I is

 overridden by a statutory minimum of ten years, so the 21 to 27 months, of course, would apply to Counts XI and XII....

 Sentencing Transcript of Arthur Hooks at 8–9.

2. The dissent's argument that the jury made a finding as to quantity disregards the text of the instructions. Instruction number 14 stated:

 The crime of conspiracy, as charged against the defendants in Count One of the indictment, has three essential elements, which are:

 *One,* on or about February 15, 1990, two or more persons reached an agreement or came to an understanding to distribute cocaine base ("crack");

 *Two,* each defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect; and

 *Third,* at the time each defendant joined in the agreement or understanding, he or she

The same standards govern the district court's drug quantity determinations for section 841(b) and the Sentencing Guidelines. *United States v. Johnson,* 944 F.2d 396, 405 (8th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991). The district court may sentence Hooks for crack possessed and sold by Roulette and Travis if it finds by a preponderance of the evidence that their activities were (1) in furtherance of the conspiracy and (2) were either known to Hooks or were reasonably foreseeable to Hooks. *See United States v. North,* 900 F.2d 131, 133 (8th Cir.1990) (citing U.S.S.G. § 1B1.3, comment.).

In multi-level drug networks, defendants may aid conspiracies that span far beyond their actual participation. For activities of a co-conspirator to be "reasonably foreseeable" to a defendant, they must fall within the scope of the agreement between the defendant and the other conspirators. *See United States v. Edwards,* 945 F.2d 1387, 1393 (7th Cir.1991). Thus, if a defendant agrees to aid a large-volume dealer in completing a single, small sale of drugs, the defendant will not be liable for prior or subsequent acts of the dealer that were not reasonably foreseeable. U.S.S.G. § 1B1.3 illustration e; *see also United States v. Knapp,* 955 F.2d 566, 570–71 (8th Cir.1992) (Bright, J., concurring); *Edwards,* 945 F.2d at 1392; *United States v. Matthews,* 942 F.2d 779, 785 (10th Cir.1991).

Hooks and Sanders received small quantities of crack from Roulette to sell and smoked much of that themselves. The Government argues that Travis's visits to Roulette at Hooks's residence to "cut up" large amounts of crack prove that Hooks knew he had joined a large-scale conspiracy. We disagree. Sanders did not testify that Hooks knew in any way of these activities. The Government also argues that Sanders testified that on one occasion Hooks learned from a conversation be-

tween Sanders and Roulette that Roulette received "weight," or large quantities of crack, from "Big Daddy," a.k.a. Travis. IIA Tr. at 405. Sanders cannot remember even the approximate date of this conversation. *Id.* This evidence hardly suffices, by itself, to prove that Roulette's large-scale activities were a reasonably foreseeable part of Hooks's conspiracy with Roulette. Simply because a defendant knows that a dealer he works with sells large amounts of drugs to other people does not make the defendant liable for the dealer's other activities. *North,* 900 F.2d at 134; *see also Edwards,* 945 F.2d at 134. To determine reasonable foreseeability, we also examine whether a defendant benefitted from his co-conspirators' activities. *North,* 900 F.2d at 134. Hooks never received any benefits from Roulette's large quantity sales to Tisinger and received only a few "rocks" from Roulette as pay for his work. Therefore, we hold that Hooks cannot be sentenced for participating in a conspiracy to distribute at least fifty grams of crack. We vacate Hooks's sentence and remand for the district court to determine the amount of crack Hooks personally distributed, or aided in distributing, in furtherance of the conspiracy and to sentence Hooks based only on that amount.

## I. Travis's Sentence

For violating 21 U.S.C.A. § 841(b)(1)(A) (West Supp.1991), the district court sentenced Travis, as an offender with two prior drug felony convictions, to the mandatory sentence of life in prison without parole.[3] Travis argues that section 841(b)(1)(A)'s mandatory life sentence constitutes cruel and unusual punishment in violation of the eighth amendment based on *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), because the statute requires no review of whether a sentence is proportional to a defendant's crime. The Supreme Court recently mod-

---

knew the purpose of the agreement or understanding. The remainder of the instruction elaborates on the "essential elements." The instructions did not tell the jury to consider quantity as an "essential element" of guilt, under Count I;

thus, the jury could have found Hooks guilty of Count I without making a quantity finding.

**3.** Travis was convicted of felony possession of cocaine in California, twice in 1985 and once again in 1986.

ified its views in *Harmelin v. Michigan,* — U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), and held that the eighth amendment forbids only extreme sentences that are "grossly disproportionate to the crime." *Id.* 111 S.Ct. at 2707 (Opinion of Kennedy, J.). The *Harmelin* Court concluded that a sentence of life without parole for a serious drug crime (possessing less than one kilo of cocaine) is not cruel and unusual punishment. *Id.* Here, Travis committed a serious drug crime and also has three prior drug felony convictions. We cannot say as a matter of law that the mandatory sentence of life in prison violates the eighth amendment's ban on cruel and unusual punishment.[4] *United States v. Harvey,* 946 F.2d 1375, 1378 (8th Cir.1991); *United States v. Johnson,* 944 F.2d 396, 408–09 (8th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991). We have considered the remainder of Travis's arguments against his sentence and hold them to be without merit.

### J. Roulette's Sentence

 We now comment on the severe sentence meted out to Roulette, age twenty-four, a person without any prior felony convictions. Roulette will serve a total of forty-four years and seven months in prison without parole for this first conviction. The sentence amounts to practically a life sentence. The heavy sentence rests on counts V and VIII, each alleging Roulette's willful use of a firearm during a drug transaction in violation of 18 U.S.C.A. § 924(c) (West Supp.1991). Upon conviction, the district judge imposed a sentence of nineteen years seven months for counts I, II, III, IV, VI and VII, imposed a consecutive sentence of five years for count V and an additional consecutive sentence of twenty years for count VIII.

The district court imposed the sentences for counts V and VIII under 18 U.S.C.A.

§ 924(c) (West Supp.1991), which mandates a five year sentence for a first offense and, in the case "of his second or subsequent conviction" a sentence of twenty years. *Id.* This court has previously held that a defendant's first and second convictions may arise from counts alleged in the same indictment. *United States v. Foote,* 898 F.2d 659, 668 (8th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 112, 112 L.Ed.2d 81 (1990). This ruling requires that we affirm Roulette's sentence, which may appear harsh.[5] Yet section 924(c) might reasonably be read to require that an offender be convicted of his first offense before he commits the offense resulting in his "second conviction." For such a view to apply to Roulette requires an en banc rehearing. *See* Part IV. Addendum.

 Roulette also argues that the district court erred in refusing to grant him a two-level reduction of his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1. Roulette argues that because he confessed shortly after police arrested him and gave statements that aided police, the district court should have found that he accepted responsibility. We reverse findings of a sentencing court in this area only if they are "without foundation." *United States v. Youmans,* 926 F.2d 747, 749 (8th Cir.1991). Roulette never pled guilty to his crimes and did not cease illegal activities voluntarily. Therefore, he clearly did not qualify for the reduction. We reject, as without merit, Roulette's argument that the district court made prejudicial remarks during his sentencing.

### K. Jones's Sentence

 Jones appeals her sentence of 188 months (fifteen years eight months). The district court assessed Jones's base offense level at 34. With a criminal history category I, the sentencing range for Jones was 151–188 months (twelve years seven

---

**4.** It is not for this writer to criticize congressional legislation, notwithstanding a personal view that mandatory sentences are often unjust and that trial judges should possess some discretion in sentencing matters.

**5.** Roulette's counsel challenged Roulette's sentence under section 924(c) for the first time in oral argument and we review the district court's ruling only for plain error that would cause a miscarriage of justice. *United States v. Fritsch,* 891 F.2d 667, 668 (8th Cir.1989).

months—fifteen years eight months). Jones argues that the Guidelines violate her due process rights by depriving the district court of discretion to consider the specific circumstances of her crime. This court has repeatedly rejected such arguments. *E.g., United States v. Abdullah,* 947 F.2d 306, 312–13 (8th Cir.1991); *United States v. Weaver,* 906 F.2d 359, 360 (8th Cir.1990). However, due process requires that "[w]hen the guidelines fix a sentencing range spanning more than twenty-four months, the district court must state in open court 'the reason for imposing a sentence at a particular point within the range.'" *United States v. Dumorney,* 949 F.2d 997, 997 (8th Cir.1991) (quoting 18 U.S.C. § 3553(c)(1) (1988)). At the sentencing hearing, the district court listed the ongoing nature of the offenses Jones committed and the need to deter Jones from committing those offenses in the future as reasons for assessing her sentence at the high range of the Guidelines. We conclude that the district court gave adequate reasons for imposing Jones's sentence where it did within the applicable range.

## III. CONCLUSION

We affirm, except that we vacate Hooks's sentence, No. 91–2008, and remand for further proceedings not inconsistent with this opinion.

## IV. ADDENDUM

We suggest that Roulette's case, No. 91–2091, be reheard en banc to reconsider the rule created by the panel's opinion in *United States v. Foote,* 898 F.2d 659, 668 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 112, 112 L.Ed.2d 81 (1990). In *Foote,* a panel held that section 924(c)'s mandatory twenty-year sentence "for the second or subsequent conviction under this subsec-

tion" applies even when a defendant's first and second convictions arise from conduct charged in the same indictment. *Id.* We should reconsider the law expressed by the panel in *Foote* because section 924(c) is ambiguous and should be construed in favor of a defendant such as Roulette.[6] A defendant should not be penalized for a "second conviction" unless he has already experienced a first conviction when he committed the second offense.

18 U.S.C.A. § 924(c) reads in relevant part:

> Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime ... be sentenced to imprisonment for five years.... In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years....

18 U.S.C.A. § 924(c)(1) (West Supp.1991).

In this case, the court sentenced Roulette to consecutive five and twenty-year sentences because the jury convicted Roulette of twice violating section 924(c)(1).[7] Roulette had never been convicted of violating section 924(c) before police arrested him for the crimes he committed in this case. This court and several other circuits have held that an offender's first and second convictions under section 924(c) may arise from crimes charged in the same indictment. *United States v. Bernier,* 954 F.2d 818 (2d Cir.1992); *United States v. Raynor,* 939 F.2d 191, 193–94 (4th Cir.1991); *United States v. Nabors,* 901 F.2d 1351, 1357–59 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990); *United States v. Bennet,* 908 F.2d 189, 194 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990); *Foote,* 898

---

**6.** Much of the reasoning in this section was borrowed from the excellent opinion of Judge Seymour, who wrote for the en banc Tenth Circuit in *United States v. Abreu,* 962 F.2d 1447 (10th Cir.1992).

**7.** In oral argument, Roulette's counsel argued that the decision in *United States v. Freisinger,* 937 F.2d 383, 391 (8th Cir.1991), suggested that the convictions under section 924(c) should oc-

cur at separate times. However, the *Freisinger* court held that two section 924(c)(1) convictions must stem from two separate episodes of criminal conduct. The *Freisinger* court acknowledged that, under *Foote,* crimes stemming from two different times could be brought as first and second convictions in the same indictment under section 924(c)(1). *Id.*

F.2d at 668; *United States v. Rawlings,* 821 F.2d 1543, 1546–48 (11th Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987). However, as the Tenth Circuit recognized, ambiguity exists in the language of section 924(c) suggesting that the offense causing the "second or subsequent conviction" under section 924(c) must be committed after the first conviction. *United States v. Abreu,* 962 F.2d 1447, 1450 (10th Cir.1992) (en banc).

To ascertain the meaning of "second or subsequent conviction," we must examine the ordinary meaning of those words. *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). "Second" is defined as "next after the first in place, time, or value." *Random House Dictionary of the English Language* 1729 (2d ed. 1987). "Subsequent" is defined as "occurring or coming later or after." *Id.* at 1896. When either of these words is used to describe an event, it describes one that has occurred separately, at a later time from a prior event. "Conviction" is defined as "the result of a criminal trial which ends in a judgment or sentence that the accused is guilty as charged." *Black's Law Dictionary* 333 (Deluxe ed. 1991). According to this definition, one could reasonably interpret section 924(c) to require that a second conviction must at least occur at a separate trial from a first conviction. Thus, the ordinary meaning of the words "second or subsequent conviction" does not unambiguously lend itself to the interpretation given those words by this court in *Foote* and several other circuits. Indeed, the Sixth Circuit in *Nabors* acknowledged that section 924(c) "is, at best, hard to follow in simple English," and held that the district court had not clearly erred in interpreting section 924(c) to not permit an enhanced sentence when both predicate offenses were charged in the same indictment. *Nabors,* 901 F.2d at 1359; *see also United States v. Godwin,* 758 F.Supp. 281, 283 (E.D.Pa.1991) (rejecting interpretation of other circuits, due to ambiguity of section 924(c), and refusing to apply enhanced sentence of section 924(c) to defendant when both predicate offenses charged in same indictment).

Because nothing in the plain language of section 924(c) explains whether a "second or subsequent conviction" may occur when a defendant has yet to experience a first conviction, we must examine section 924(c)'s legislative history. *See Premachandra v. Mitts,* 727 F.2d 717, 727 (8th Cir.1984). Sparse legislative history exists regarding section 924(c).

> [Section] 924(c) was offered as an amendment on the House floor by Representative Poff, and passed on the same day. Accordingly, the committee reports and congressional hearings to which we normally turn for aid in these situations simply do not exist, and we are forced in consequence to search for clues to congressional intent in the sparse pages of floor debate that make up the relevant legislative history.

*Busic v. United States,* 446 U.S. 398, 405, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980) (citations omitted).

Representative Poff, one of section 924(c)'s sponsors, made one of the few relevant observations about the language in question. He stated that the intended effect of the provision's minimum mandatory penalty was:

> To persuade the man who is tempted to commit a federal felony to leave his gun at home. Any such person should understand that if he uses his gun and is caught and convicted, he is going to jail. He should further understand that if he does so a second time, he is going to jail for a longer time.

114 Cong.Rec. 22231 (daily ed. July 19, 1968).

Representative Rogers echoed Poff's statement:

> [A]ny person who commits a crime and uses a gun will know that he cannot get out of serving a penalty in jail. And if he does it a second time, there will be a stronger penalty.

*Id.* at 22237.

The sponsors of section 924(c) were equivocal as to whether "a second time" may occur only after a person has been caught and sent to jail a first time. We

assume that the authors of section 924(c) intended to duplicate Congress's similar schemes for punishing repeat offenders and interpret section 924(c) *pari passu* with statutes with similar language. *See Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 755, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979); *Northcross v. Board of Educ. of Memphis City Schools*, 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973) (per curiam). When Congress has enacted statutes enhancing a sentence for a second conviction, it has required that the second offense be committed after a prior conviction. *See, e.g.*, 21 U.S.C. § 841(b)(1) (1988) (enhanced sentence "if any person commits such a violation after a prior conviction"); 21 U.S.C. § 844 (1988) (enhanced sentence for simple possession if second conviction committed after a prior conviction); 21 U.S.C. § 859(b) (1988) (enhanced sentence for distributing drugs to a minor if second offense occurs "after a prior conviction"); 21 U.S.C. § 861(c) (1988) (enhanced sentence for employing minor in drug trafficking if second offense occurs "after a prior conviction has become final"); 21 U.S.C. § 962 (1988) (defining "second or subsequent offense" for illegal drug importation as when second offense occurs after prior conviction has become final). The Eleventh Circuit in *Rawlings* reasoned that because Congress used different language in section 924(c) from other enhancement statutes, it intended a different result. 821 F.2d at 1546. However, section 924(c)'s abbreviated legislative history illustrates that Congress did not closely examine other parts of the federal criminal code before it acted.

▪ The reading of the language and legislative history of section 924(c) disclose an ambiguity. When courts face two reasonable interpretations of a criminal statute and Congressional intent is unclear, the rule of lenity requires adoption of the less punitive alternative. *See Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *United States v. Bass*, 404 U.S. 336, 347–48, 92 S.Ct. 515, 522–23, 30 L.Ed.2d 488 (1971); *United States v. Freisinger*, 937 F.2d 383, 391 (8th Cir.1991) (construing ambiguous language

of section 924(c)(1) in defendant's favor in different context). Therefore, we must read ambiguities in section 924(c) in favor of defendants such as Roulette who had not previously been convicted when they committed a second section 924(c) violation.

The panel in *Foote* asserted that requiring convictions in separate indictments was an unreasonable interpretation of section 924(c) because the prosecutor could place "each section 924(c) violation by the same defendant into a separate indictment in order to trigger the [twenty-year] penalty provision." 898 F.2d at 668. Therefore, a prosecutor could simply manipulate the indictments to invoke the additional penalty. However, under a reasonable reading of section 924(c), that section does not permit a prosecutor to avoid the separate conviction requirement because a defendant must have been convicted of the first section 924(c) offense before committing the second.

The Eleventh Circuit in *Rawlings* posited that because Congress intended section 924(c) to deter criminals from using guns, it should be interpreted in the harshest manner possible. 821 F.2d at 1546. However, punishing first offenders with twenty-five-year sentences does not deter crime as much as it ruins lives. If, after arrest and conviction, a first offender is warned that he will face a mandatory twenty-year sentence if he commits the same crime again, then the offender will know of the penalty. Having already served at least five years in prison, he will have a strong incentive to stay out of trouble. Discouraging recidivism by people who have already been in prison and been released serves a far more valuable purpose than deterring offenders who have yet to be arrested and have no knowledge of the law's penalties. *See Abreu*, 962 F.2d at 1452–53.

For the reasons given above, this panel suggests a rehearing en banc to reconsider this court's interpretation of section 924(c).

JOHN R. GIBSON, Circuit Judge, dissenting.

I respectfully dissent from the vacation of Hooks' sentence and the remand for

**1522**

resentencing. I also dissent from the panel's suggestion to rehear this case en banc to reconsider our court's interpretation of 18 U.S.C. § 924(c).

Count One of the indictment charged Hooks and the other defendants with conspiracy "to distribute 50 grams or more" of crack. This indictment was read to the jury in the court's instructions, together with what the court refers to as a generic conspiracy instruction. The instructions were given to the jury members when they deliberated, and they returned a verdict stating that Hooks was guilty "of the crime charged in Count One of the indictment." This is a jury finding as to quantity, and the district court so recognized it in sentencing. The court today does not suggest that we set aside this conviction for insufficiency of the evidence. Indeed, there was evidence that when Hooks joined the conspiracy to distribute crack out of his house, the quantities handled by the conspirators were reasonably foreseeable by him. The jury's verdict found the quantity that requires the ten-year mandatory minimum sentence. I would affirm this sentence.

With respect to 18 U.S.C. § 924(c), this court has spoken clearly and I am not persuaded by the opinion of the Tenth Circuit in *United States v. Abreu*, 962 F.2d 1447 (10th Cir.1992) (en banc), that we should reconsider the issue. In *Abreu*, the Tenth Circuit adhered to the views expressed by Judge Seymour in the panel decision, *United States v. Thornburgh*, 962 F.2d 1438 (10th Cir.1992). As the dissent points out, however, the Tenth Circuit's decision is contrary to that of the other six circuits, including this one, which have decided the issue, and interjects terms into the statute not included and not intended by Congress. I do not agree that the issue deserves en banc consideration.