# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 02-1006/3031

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Luis Manuel Espinoza, | * | |
| also known as Daniel Mendoza, | * | |
| | * | |
| Appellant. | * | |

_____

No. 02-3581

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Alejandro Montoya, | * |
| | * |
| Appellant. | * |

_____

Submitted: October 23, 2003

Filed: November 10, 2003

_____

Before LOKEN, Chief Judge, LAY and BOWMAN, Circuit Judges.
_____

BOWMAN, Circuit Judge.

After a jury trial, Luis Espinoza and Alejandro Montoya were both convicted of aiding and abetting possession of methamphetamine with intent to distribute and of conspiracy to possess with intent to distribute methamphetamine. On appeal, Espinoza argues that his due-process rights were violated by the prejudicial comments made by the government during closing arguments. For his part, Montoya challenges the sufficiency of the evidence. We affirm.

As part of an ongoing investigation into the trafficking of methamphetamine into Duluth, Minnesota, officers with the Minnesota Bureau of Criminal Apprehension (MBCA) executed a search warrant at John Horton's home, where they found drugs and other evidence of illegal activities. Horton agreed to cooperate with the authorities and identified two Hispanic men (known to Horton by their aliases) as his source. These men, he told the officers, were currently in town with a large quantity of methamphetamine and were staying at a nearby casino. After they verified that the individuals Horton identified were indeed at the casino's hotel, officers obtained a search warrant and entered their room. There the officers found the defendants, as well as two women, 750 grams of methamphetamine in several packages, and various notes that suggested illegal drug transactions and that established a link between the defendants and Horton. The MCBA officers also recovered a revolver from the defendants' car.

At trial, Horton testified that he was introduced to Montoya by a third party and that he purchased methamphetamine from Montoya on several occasions by using the third party as a middleman. For instance, on one occasion Horton arranged to buy one ounce of methamphetamine from Montoya for $1,000, and gave the middleman $400 as a down payment. Several days later, Montoya and the middleman delivered

the drugs and, a few days after that, Montoya, Espinoza, and the middleman returned to collect the remaining $600 still owed on the purchase price. Horton also testified, and it was confirmed through phone records, that he allowed Espinoza to use his address as a billing address for Espinoza's cellular telephone. Horton testified to other dealings with the defendants including one immediately before the arrests. On the day Horton's home was searched, Montoya and Espinoza came to Horton's home with two women and they discussed a drug purchase. The defendants stated that they did not have the drugs with them and would have to "leave and break it up." Horton and Montoya agreed that the drugs would be "fronted" and that Horton would pay for them later. Later in the day, Horton met the defendants at their hotel and obtained from them one ounce of methamphetamine. Still later in the day, Horton's home was searched, the drugs were found, and Horton agreed to cooperate. Early the next day, the MBCA officers searched the defendant's hotel room and arrested them. In addition, the government presented evidence seized by MBCA officers during their search of the defendants' hotel room and car. This evidence was in the form of drug notes and phone numbers that demonstrated a link between the defendants and Horton and corroborated Horton's account of events. In short, the evidence of guilt was overwhelming.

Because Espinoza did not object to the prosecutor's statements at trial, our review is for plain error. United States v. Skarda, 845 F.2d 1508, 1511 (8th Cir. 1988). Under plain-error review, Espinoza must show not only that the prosecutor's remarks were improper, but also that the remarks prejudicially affected his rights so as to deprive him of a fair trial. United States v. Neumann, 887 F.2d 880, 886 (8th Cir. 1989), cert. denied, 495 U.S. 949 (1990). During closing arguments, Espinoza's attorney attacked Horton's credibility and argued that:

> [T]he most outstanding thing about Mr. Horton, and you're going to be told to use your life experiences to determine who is not so forthcoming, not so truthful, in other words, [for] lack of a better word, a liar. And

-3-

the amazing thing about Mr. Horton was his inability to look at you. He just wouldn't do that. They say, many say, and it's been said over and over from famous writers, that your eyes are the windows to your soul. That is why we want to look you in the eye when we say what is true and not. That is why this box is facing you. But no matter how much I demanded of him to give you the respect you deserve, of looking you in the eye, he just wouldn't do it.

Trial Tr. at 369. In response to these statements, the prosecutor in the government's rebuttal, stated that:

Now, perhaps I missed it. Perhaps I missed it. I was trying to pay close attention, but I don't recall a single incidence where [the defense counsel] demanded of Mr. Horton that he look you guys in the eye and testify, and he refused to do that. Perhaps it did occur, but I missed it. What I recall occurring in this case with Mr. Horton and every witness that testified, including [a defense witness], is that the witness most often would look to the lawyers who was [sic] directing the question to them in response. There's no evidence that Mr. Horton was lying to you because he was afraid to look you in the eye. Just as if there's no evidence that [the defense witness] lied to you because he looked to me when I was asking the questions. So it's nice. It's a nice little comment, it's cute, but it has no place in this case, and has no place in your deliberations.

Id. at 398–99. We can discern no plain error in these comments. See United States v. Benitez-Meraz, 161 F.3d 1163, 1167–68 (8th Cir. 1998). A jury is free to draw conclusions of credibility based on a witnesses demeanor (indeed, that is one of its main functions); consequently, the prosecutor's statements summarizing and rebutting the defendant's claims regarding Mr. Horton's demeanor were entirely proper. See, e.g., United States v. Grey Bear, 883 F.2d 1382, 1392 (8th Cir. 1989), cert. denied, 493 U.S. 1047 (1990). As for the prosecutor's characterization's of the defendant's claims as "nice" and "cute," these were not improper. These were not his personal

views on the evidence before the jury. Rather, they merely characterized defense counsel's argument. Accordingly, we reject Espinoza's claim.

In his appeal, Montoya urges that the evidence was insufficient to support his convictions. Although we review this issue de novo, we view the facts in the light most favorable to the verdict and resolve conflicts in favor of the verdict; we will sustain the verdict if, based on our review, a reasonable jury could have found the defendant guilty of the charged conduct beyond a reasonable doubt. United States v. Aguayo-Delgado, 220 F.3d 926, 934 (8th Cir.), cert. denied, 531 U.S. 1026 (2000). We think it self-evident from our recounting of the evidence presented that there was more than enough evidence from which a reasonable jury could have determined that Montoya was guilty beyond a reasonable doubt.

To convict Montoya of aiding and abetting, the Government had to prove that he associated himself with the unlawful venture, that he participated in it as something he wished to bring about, that he sought by his actions to make it succeed, and that he shared the criminal intent of the principal. United States v. Brownlee, 890 F.2d 1036, 1038 (8th Cir. 1989). There is no question that there was sufficient evidence to convict Montoya of aiding and abetting, for the evidence tended to show: that he arranged, financed, and participated in drug sales with his partner Espinoza; that he collected the proceeds of the drug sales in cash and arranged other forms of payment; and that he was in joint possession with Espinoza of 750 grams of methamphetamine when he was arrested. To convict Montoya of conspiracy, the government had to prove that a conspiracy existed, that Montoya knew of the conspiracy, and that he knowingly became a part of it. Aguaya-Delgado, 220 F.3d at 934. The government presented ample evidence from which a reasonable jury could conclude beyond a reasonable doubt that Montoya was involved in an illegal conspiracy. Here, the evidence established: that Montoya took part in several drug transactions involving Horton, the middleman, and Espinoza; that Montoya, in cooperation with Espinoza, possessed a quantity of methamphetamine that is

inconsistent with personal use; and that Montoya knew there was a conspiracy and chose to join it because he played an active role in arranging, financing, and completing the drug sales. The evidence presented was irreconcilable with any defense that Montoya was merely present while Espinoza conducted his illegal drug business.

For the reasons stated, the defendants' convictions are affirmed.

_____